74 March 26, 2015 No. 12

IN THE SUPREME COURT OF THE
STATE OF OREGON

Billie Charles TOWE,
*Petitioner on Review,*

*v.*

SACAGAWEA, INC.,
dba Re/Max Equity Group, Inc.;
Re/Max International, Inc.;
and Rick J. Matthews;
*Defendants,*

*and*

Rick J. MATTHEWS
and Sherry Matthews,
dba Mountain View Rock;
and Re/Max Ideal Properties, Inc.;
*Respondents on Review.*

(CC 084951L2; CA A142775; SC S059896)

On review from the Court of Appeals.*

Argued and submitted November 5, 2012; resubmitted January 7, 2013.

Robert Udziela, Portland, argued the cause for petitioner on review. With him on the brief were J. Randolph Pickett, R. Brendan Dummingan, Kristen West, and Kimberly O. Weingart, Pickett Dummigan LLP, Portland.

Andrew Grade, Fotouhi Epps Hillger Gilroy Mau PC, Lake Oswego, argued the cause and filed the brief for respondents on review Rick J. and Sherry Matthews, dba Mountain View Rock. David O. Wilson, Law Offices of Thomas A. Andersen, Eugene, filed the brief for respondent on review Re/Max Ideal Properties, Inc.

Shenoa L. Payne, Haglund Kelley Jones & Wilder, LLP, Portland, filed a brief on behalf of *amicus curiae* Oregon Trial Lawyers Association.

_____

* Appeal from Jackson County Circuit Court, G. Philip Arnold, Judge. 246 Or App 26, 264 P3d 184 (2011).

Before, Balmer, Chief Justice, and Kistler, Walters, Linder, Brewer, and Baldwin, Justices.**

LINDER, J.

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court for further proceedings.

_____

** Landau, J., did not participate in the consideration or decision of this case.

**LINDER, J.**

Plaintiff was injured while riding his motorcycle on a private road that provided access to several pieces of property. On the upper part of the access road, a cable had been stretched across the road to prevent entrance to a quarry at the end of the access road. Plaintiff failed to see the cable in time to stop and was injured when his motorcycle hit the cable.

Plaintiff brought this action for negligence against Rick and Sherry Matthews, doing business as Mountain View Rock (Mountain View), who had placed the cable across the access road where the road crossed onto their property. Plaintiff joined Re/Max Ideal Properties, Inc. (Re/Max), as a defendant in the action, on the theory that Re/Max, by advertising property along the access road as "for sale," was at least partly responsible for causing plaintiff to ride his motorcycle up the access road. The trial court granted summary judgment for defendants, concluding as a matter of law that plaintiff was "100% responsible for his injuries and no reasonable juror could find otherwise." A majority of the Court of Appeals affirmed on the alternative grounds that Mountain View, as a matter of law, did not breach any duty of care that it owed to plaintiff and that Re/Max, as a matter of law, could not be found by a reasonable jury to have caused plaintiff's injuries. *Towe v. Sacagawea, Inc.*, 246 Or App 26, 264 P3d 184 (2011). We allowed review and, as we will explain, we reverse the decision of the Court of Appeals in part and affirm in part, and we remand to the trial court for further proceedings.

## I.   FACTS

Plaintiff was injured while riding his motorcycle in November 2006. The road on which plaintiff was injured is a side road off Indian Creek Road in rural Jackson County that provides access to four properties. One property is owned by the Bureau of Land Management (the BLM); a second property has a residence on it and is owned by the Clarkes; a third property, which is unimproved, formerly was owned by a person named Kinyon (the "Kinyon property");[1] and the

---

[1] The property once owned by Kinyon actually consists of three five-acre parcels, one of which sits parallel to and abuts the access road, and two of which sit

final property is a rock quarry owned by Mountain View. The access road ends at the quarry. The access road is gravel-surfaced up to Mountain View's property; from that point on, the road is paved.

Where the access road crosses onto Mountain View's property, and changes from gravel to paved road, Mountain View placed a cable across the road in an effort to deter theft and vandalism at the quarry. The cable was on or nearly on Mountain View's property line, and stretched between two metal posts on either side of the road. The record suggests that the quarry operated sporadically, usually with a crew of two or three workers. On days when the quarry operated, the first worker to arrive in the morning generally would unlock and unhang the cable by moving it to the side of the road. Conversely, the last worker to leave in the afternoon or evening would rehang the cable and relock it. The evidence permits competing conclusions, however, as to whether workers were consistent in rehanging the cable. Although the record contains evidence that workers were reliable about rehanging and locking the cable when they left the quarry for the day, the record also contains evidence that people had traveled the road on weekends and other times when the quarry was closed, and did not notice the cable and were not blocked by it from continuing along the road onto Mountain View's property.[2]

off the access road, adjacent to the first parcel. Although the record suggests that the three parcels are separate lots subject to separate purchase and ownership, for present purposes, we treat all three as one parcel.

When the depositions were taken in this case, no one could identify the current owner of the property that Kinyon formerly had owned. Kinyon was an investor who did not reside on the property, and his name did not mean anything to the local residents. In recent years, the property had changed hands as many as four times. For ease of reference, we refer to that property as the "Kinyon property" even though it was not locally known as that.

[2] Some of the facts that we recite are not disputed. Others are. Consistently with the applicable standard of review, we describe the disputed evidence in the light most favorable to plaintiff. *See Loosli v. City of Salem*, 345 Or 303, 306 n 1, 193 P3d 623 (2008) (after grant of summary judgment, facts are viewed by reviewing court in light most favorable to nonmoving party); ORCP 47 C (on summary judgment, trial court must determine whether there is no genuine issue of material fact "based upon the record before the court viewed in a manner most favorable to the adverse party"). In doing so, we nevertheless highlight certain key factual disputes, because those disputes have particular bearing on our later determination of whether summary judgment should have been granted.

The evidence relevant to the cable's condition was also disputed. Viewed in plaintiff's favor, the cable hung only about 10 to 12 inches off the ground, and it was weathered and rusted. Likewise, the metal posts on either side of the road to which the cable was attached were rusted steel and not particularly visible. An orange construction cone had been threaded onto the cable, apparently to make the cable more visible, but the cone was faded and covered with black dirt. Three pieces of yellow caution tape also had been tied along the cable. After the accident, a no trespassing sign was found face up on the ground nearby, but not attached to the cable or otherwise visibly posted at the boundary to Mountain View's property. According to Clarke, who occasionally worked at the quarry, the no trespassing sign sometimes hung from the middle of the cable, but it "would fall off" because of the way it was attached.

The parties also dispute the extent to which the privately owned access road was open to the public. The record establishes that the access road is privately owned by three different parties. The first portion of the access road is owned by the BLM. The next portion of the road is owned by the owner of the Kinyon property. The last portion of the access road—beginning at or about where the cable had been strung—is owned by Mountain View. As earlier described, the road also provides access to a parcel of land owned by and resided on by the Clarkes, which is near the entrance to the access road off Indian Creek Road. But the Clarkes do not own the portion of the access road that is adjacent to their property; instead, the BLM owns that portion of the road.

A sign was posted where the access road intersected with Indian Creek Road—that is, where people might turn off Indian Creek Road and onto the access road. The sign was divided into three parts. The top third of the sign identified Mountain View and listed phone numbers for that business; the middle third identified the Clarkes and listed their address; and the bottom third of the sign stated "Private Road No Trespassing." Rick Matthews, who owned Mountain View, had the sign made and put it up sometime in 2003 or 2004. There was no similar "no trespassing" sign for either the BLM or the Kinyon properties. Rather, the

only evidence as to whether the BLM permitted the public to travel its portion of the road is that the BLM had previously prohibited Mountain View from closing a gate that Mountain View and Clarke, at some point in the past, had constructed across the access road near the intersection with Indian Creek Road. The only evidence as to whether the owner of the Kinyon property did or did not permit public use of the adjacent portion of the road is that, in January 2006 (about 10 months before the accident that resulted in this case), Kinyon had listed his property for sale with Re/Max and Re/Max, in turn, had posted a sign at the intersection with Indian Creek Road with a directional arrow pointing up the access road.

That sign with the directional arrow is significant to plaintiff's claim against Re/Max. In addition to the directional sign that Re/Max had placed at the intersection with Indian Creek Road, Re/Max also had placed a second sign on the Kinyon property that was visible from the access road and that identified the property as "for sale." That second sign had been located about 120 to 150 yards before the point where Mountain View's cable hung across the road. The Re/Max agent had visited the property and had seen the cable stretched across the access road, near the boundary line for Mountain View's property. At some time before the accident occurred, around the end of August or beginning of September 2006, the Re/Max agent removed the sign on the Kinyon property because the listing with Re/Max had been withdrawn. The agent, however, inadvertently left the directional sign posted at the intersection near the base of the access road.

Plaintiff was familiar—at least, in a general way—with the access road and the properties along it. Plaintiff lives on another access road off Indian Creek Road, approximately two miles from the accident site. He had worked for Mountain View at the quarry for a few days 10 to 11 months before the accident. He knew that the area of the road above the cable crossed on to Mountain View's private property and was owned by Mountain View. Plaintiff also knew about the cable itself. At least once during the brief time that he worked for Mountain View, plaintiff had taken down the cable when he arrived in the morning; he thought

he had probably put it up once when he left as well. Plaintiff also understood that the cable was up "quite often" when the quarry was closed. But the cable was not up at least two times when plaintiff had gone up the access road while the quarry was closed, one of which was on a Sunday. Finally, plaintiff, at the time of the accident, knew where the Kinyon property was located and was aware that it had been for sale. In fact, he and his girlfriend had driven up the access road the spring before the accident when it was listed for sale by Re/Max, saw the "for sale" sign marking the property, and walked around the area on foot.

Plaintiff's ongoing interest in property for sale in the area was what prompted him to ride up the access road on the day of the accident. His girlfriend had mentioned to him the weekend before, and again the weekend of the accident, that there were three or four properties for sale up the access road. She also had said that they would not sell, because the owner of Mountain View would not allow an easement on the road to access them. In plaintiff's words, he believed those properties "must be on [Mountain View's] private road where the cable is—you know, where the cable is, up that paved road or something."

The accident occurred after 4:00 p.m. on Sunday, November 5, 2006. Plaintiff and another person, Koch, were riding their motorcycles on Indian Creek Road. Plaintiff was following Koch, because Koch had been having some mechanical difficulties with his motorcycle. Koch turned onto the access road; plaintiff did not know why Koch decided to take that route. Plaintiff decided, however, that he would follow Koch so that he could look at the property that his girlfriend had told him was for sale up the road. He saw the Re/Max directional sign at the entrance to the access road, which caused him to think about the properties that his girlfriend had described. As plaintiff testified in his deposition:

"A  *** The reason for me to go down that road is more property for sale, where is it. That was the reason I went down there.

"Q  Well, the first time you said that the reason he went down the road was you were following [Koch], right?

"A   Right. *** I wondered why he [Koch] turned on
that road. And then the Re/Max [directional] sign is down
here at the bottom of the road; I said well, might as well go
up there and see where there's properties for sale."

Koch took the lead as the two rode up the access
road, and plaintiff followed. As they rode past the Kinyon
property and towards Mountain View's property, plaintiff
was looking for the properties that his girlfriend had told
him about. Plaintiff saw that the sign that had been on
the Kinyon property was no longer there, but he thought
that the properties his girlfriend had mentioned were in
the same general vicinity, probably on Mountain View's
privately owned portion of the road, and plaintiff was look-
ing for "another sign" to indicate where they were. Plaintiff
characterized his eyes as "wandering," looking for a posted
sign that would indicate where there was "more property"
for sale.

What plaintiff did not think about was the cable. He
expressly admitted that he "forgot" about it. Koch, likewise,
was not thinking about the cable. He had traveled the road
alone on his motorcycle before, and had done so as many as
15 times, but the cable had not been up and blocking the
road on those occasions, so Koch had never before noticed
or seen it. Koch nevertheless spotted the cable in time to
slow and stop before reaching it. Following from behind,
plaintiff saw Koch begin to slow; plaintiff passed Koch,
accelerating slightly as he did so; and then plaintiff glanced
back to see if Koch was following him.[3] During that brief,

---

[3] Both the Court of Appeals majority and dissent characterized Koch as
stopping 100 yards short of the cable, and described plaintiff as having seen the
cable for the first time when he was 25 yards away from it. *Towe*, 246 Or App
at 30 (majority); *Id.* at 47 (Sercombe, J., dissenting). The record, in our view, is
inadequate to support those observations, for two reasons. First, plaintiff offered
the estimate that Koch stopped 100 yards from the cable. He then qualified his
estimate by saying that the distance was "probably shorter" than that and he was
guessing about the distance and would need to go back to the site and measure
it. Counsel conducting the deposition assured plaintiff that counsel was just ask-
ing for "an estimate." Second, the estimates that Koch offered were dramatically
different and arguably more favorable to plaintiff than plaintiff's own. They are
also, however, difficult to credit. Koch estimated that he was only 50 *feet* or so
from the cable when he saw it, that plaintiff looked back at him after that, and
that Koch then came to a stop 20 *feet* from the cable. But Koch also described
plaintiff as having looked back at Koch and then ahead again at 20 *feet* away
from the cable, at which point was unable to stop and rode into the cable. Koch's

split-second glance, plaintiff saw that Koch had stopped and had a shocked look on his face. Plaintiff immediately looked ahead, at which point he saw the cable. He engaged his brakes, but barely had time to slow before his motorcycle hit the cable, causing it to "slingshot" back, seriously injuring him. Plaintiff estimated that his fastest speed while traveling on the access road was between 25 and 30 miles per hour, and that he was traveling only somewhat less than that speed when his motorcycle hit the cable.

## II.   PROCEDURAL POSTURE

Plaintiff brought an action for negligence against Mountain View and Re/Max in circuit court. The crux of the allegation against Mountain View was that it had been negligent in hanging the cable across the access road and failing to either mark the cable adequately or warning that it was there, given that Mountain View knew or should have known that the general public frequently traveled on the access road and that the public had been invited to inspect real property for sale on that road. The crux of plaintiff's allegation against Re/Max was that it had been negligent in putting up the sign that directed interested parties up the access road toward the cable, while also removing the second sign marking the Kinyon property for sale, the absence of which caused plaintiff to be distracted looking property for sale and thus not notice the cable, which Re/Max had not warned was there.

Both Mountain View and Re/Max moved for summary judgment on multiple grounds. As relevant to the issues presented here, Mountain View argued that, as a matter of law, it had met the requisite standard of care for a property owner regardless of whether plaintiff was a trespasser or a licensee (although it asserted that plaintiff was a trespasser). Mountain View also maintained that plaintiff was wholly responsible for his own injuries. Re/Max asserted that it was not a property owner and so had no duty of care to warn plaintiff of dangers on adjacent land. It also argued

estimates would have meant Koch stopped only one second after he first saw the cable, given his estimate that they were traveling 25 miles per hour. In all, we are not satisfied that a reasonable inference can be drawn on this record about how far Koch or plaintiff were from the cable when Koch saw the cable, began to slow, and came to a stop.

that plaintiff was solely at fault for not seeing the cable and that Re/Max did nothing to prevent plaintiff from seeing the cable. Finally, Re/Max argued that, under ordinary negligence principles, as a matter of law it should not be subject to liability for hazards on the access road based merely on its conduct in posting a real estate directional sign at the entrance to the access road.

The trial court granted summary judgment for defendants, concluding that plaintiff was solely responsible for the accident. As the trial court explained in its order:

"None of the defendants can be found negligent in not foreseeing [that plaintiff] would disobey the law requiring motorists to keep a lookout by taking his eyes off the road to turn around. Even without considering the other respects in which [plaintiff] failed to keep a lookout (by having his eyes 'wander'), at a minimum, it is undisputed [that plaintiff] did not keep a lookout when he turned around to look back at Koch.

"[Plaintiff] was driving without looking. He might as well have been driving blindfolded. Koch could see the cable and stopped. [Plaintiff] was 100% responsible for his injuries and no reasonable juror could find otherwise. * * *

"In light of the dispositive nature of [plaintiff's] undisputed testimony, the court need not reach the issues of whether [plaintiff] was an invitee or a trespasser on the private road, whether the cable should have been better marked, the import of the undisputed facts about [plaintiff's] prior knowledge that Mountain View kept a cable across the road at various times, or any of the other arguments addressed in the parties' briefs."

Plaintiff appealed to the Court of Appeals, asserting that the trial court effectively had resolved the issue based on the comparative negligence of the parties, which plaintiff urged was a factual question that should have been left to the jury to resolve. Mountain View and Re/Max defended the trial court's rationale for granting summary judgment, and they also argued alternative grounds for affirming the trial court's ruling.

A divided panel of the Court of Appeals ultimately affirmed on two of defendants' alternative grounds without

deciding the correctness of the trial court's ground of decision. Specifically, the majority concluded that, on the record developed for the summary judgment motion, plaintiff had been a trespasser on the access road as a matter of law and the only duty that Mountain View owed therefore plaintiff was a duty to avoid willful or wanton conduct. *Towe*, 246 Or App at 38-39. The Court of Appeals majority further concluded that, on the summary judgment record, a reasonable juror could not find that Mountain View's conduct had been willful or wanton. *Id.* at 40.

With regard to Re/Max, the majority affirmed summary judgment on the alternative ground that plaintiff's evidence did not create an issue of fact on causation. The majority noted that two different tests for causation—"but for" and "substantial factor"—might apply. *Id.* at 40. Under either test, the majority concluded, no reasonable juror could find that Re/Max's actions caused the injuries to plaintiff:

> "Plaintiff did not go up the road to look at the Kinyon property; rather, he testified that he went up the road to look for property that his girlfriend told him was for sale and that he believed to be on Mountain View's road, which he knew to be private. There is no indication from this record that the presence of the Re/Max sign substantially influenced his decision to travel up the access road or that, in the absence of Re/Max's conduct, the accident would not have occurred."

*Id.* at 42.

Judge Sercombe authored a dissent based on the "different factual inferences" that he drew from the record on summary judgment. *Id.* at 42 (Sercombe, J., dissenting). With regard to Mountain View's potential liability, the dissent concluded that there was evidence from which the jury could find that plaintiff was on a road open to the public at the time that he collided with the cable, *id.* at 49 (Sercombe, J., dissenting); that, even if plaintiff was a trespasser, a jury could find on this record that Mountain View was aware of constant or persistent trespassers using the access road, thus creating a greater duty on Mountain View's part, *id.* at 49-50; and that, even if plaintiff had to prove that Mountain

View had acted in a wanton manner, the record would permit the jury to so find, *id.* at 50-52.

With regard to Re/Max, the dissent thought that a reasonable juror could find "that plaintiff was induced by [the Re/Max] sign on Indian Creek Road to drive up the graveled road in search of homesites marketed by Re/Max." *Id.* at 43. Thus, in the dissent's view, the record gave rise to a jury question as to whether Re/Max's actions had the necessary causal relationship to plaintiff's injuries. *Id.* at 52-54. The dissent further concluded that a jury could find that Re/Max had been negligent in putting up a directional sign that directed the public toward a dangerous condition— the cable—that Re/Max knew about, while simultaneously not marking the particular parcel for sale, which could cause drivers to be distracted by looking for that parcel. *Id.* at 57-58. Finally, the dissent rejected the trial court's basis for its ruling, explaining that it could not conclude that plaintiff's negligence exceeded defendants' negligence as a matter of law. *Id.* at 60-61.

## III.   ANALYSIS

The resolution of this case by the trial court and Court of Appeals (both the majority and dissent), together with the parties' arguments, pose issues of causation, foreseeability, and duty that arise with frequency in negligence law. Because the case comes to us on summary judgment, our disposition depends on whether any of those issues present questions of fact for a jury's resolution as to one or both defendants.[4] For plaintiff to avoid summary judgment in favor of each defendant, plaintiff must show the existence of a factual question on all dispositive issues framed by each of defendants' motions. *See Two Two v. Fujitec America, Inc.,* 355 Or 319, 326, 325 P3d 707 (2014) (party seeking summary judgment frames issues on which party opposing summary judgment must show existence of factual question). Conversely, each defendant is entitled to summary judgment if, as a matter of law, it prevails on any of the elements

---

[4] *See* ORCP 47 C ("No genuine issue as to a material fact exists if, based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment.").

that it challenges in its motions. To better frame the issues that the parties debate, we begin with the general negligence principles that apply.

A.   *General Principles: Negligence*

Traditionally, the basic elements of common-law negligence required a plaintiff to plead and prove that the "defendant owed [the] plaintiff a duty, that [the] defendant breached that duty, and that the breach was the cause-in-fact of some legally cognizable damage to [the] plaintiff." *Brennen v. City of Eugene*, 285 Or 401, 405, 591 P2d 719 (1979) (stating elements and citing cases). In Oregon, however, the traditional duty-breach analysis is often, but not always, subsumed in the concept of reasonable foreseeability:

> "[U]nless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff."

*Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17, 734 P2d 1326 (1987). In effect, the more traditional duty-breach analysis in an ordinary negligence claim is supplanted by the question whether the defendant's conduct resulted in a foreseeable and unreasonable risk of harm of the kind that the plaintiff suffered. *Solberg v. Johnson*, 306 Or 484, 490, 760 P2d 867 (1988); *see generally Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 340, 83 P3d 322 (2004) (discussing shift in Oregon jurisprudence). Thus, when asserting an ordinary negligence claim, a plaintiff does not need to prove that the defendant owed the plaintiff a duty, because—as a general proposition—everyone owes each other the duty to act reasonably in light of foreseeable risks of harm.

But as the passage quoted above from *Fazzolari* observes, the duty element is not always subsumed in a foreseeability analysis. Rather, the nature and scope of the duty owed by the defendant to the plaintiff can be created, defined, or limited based on, among other things, the relationship between or status of the parties. Thus, the focus on reasonable

foreseeability has exceptions. One of those exceptions comes into play for premises liability. Under conventional common-law principles, when the defendant is an occupier of land and the plaintiff is someone who was injured on the defendant's land, the nature and scope of the defendant's liability to the plaintiff depends on the plaintiff's status as a licensee, an invitee, or a trespasser on the defendant's property. *See Hagler v. Coastal Farm Holdings, Inc.*, 354 Or 132, 140-41, 309 P3d 1073 (2013) (distinguishing general foreseeability principles of *Fazzolari* from special duty that possessors of land have toward invitees to correct unsafe conditions).

Neither concept—that is, neither reasonable foreseeability nor the existence of a specific duty of care based on the status of the parties or their relationship—eliminates the plaintiff's obligation to prove, as an element of a negligence claim, cause-in-fact. Conceptually, foreseeability and causation are separate elements. *Fazzolari*, 303 Or at 13. To be sure, the idea that a particular kind of harm is a reasonably foreseeable risk of some act or omission suggests the existence of a causal relationship between the the risk and the harm. But that is not the factual causation that a negligence action requires. Foreseeability is a prediction of the risk that an act or omission will result in a particular kind of harm—it turns on "what *prospectively might* happen." *Id*. (describing foreseeability) (emphasis added). Causation is an assessment of whether a particular act or omission in fact resulted in the particular harm that a plaintiff suffered—it turns on "what *retrospectively did* happen." *Id*. (describing causation element of negligence action) (emphasis added). Thus, apart from proving either that the defendant's conduct created an unreasonable risk of the kind of harm that befell the plaintiff or that the defendant breached a special duty owed to the plaintiff, the plaintiff in a negligence action must also prove an actual causal link between the defendant's conduct and the plaintiff's harm—that is, the plaintiff must prove "cause in fact." *Oregon Steel Mills, Inc.*, 336 Or at 340.

B.   *Plaintiff's Conduct as "Sole Cause" of his Injuries*

Against that backdrop, we turn to the particular issues that this case presents. We begin with the ground on

which the trial court granted summary judgment in favor of both Mountain View and Re/Max. We do so because that is the only basis for decision that is common to the claims against both defendants. Moreover, if the trial court's reasoning is correct, then that ground of decision is dispositive as to both defendants and negates the need to reach the several other issues debated by the parties.

As earlier described, in its order granting summary judgment for defendants, the trial court concluded that plaintiff was "100% responsible" for his injuries. As a predicate to that conclusion, the court set out certain undisputed facts from the summary judgment record that led the court to conclude that plaintiff was fully responsible for his injuries:

"(1)   [Plaintiff] and [Koch] were riding their motorcycles on a private road during daylight when they approached a cable across the road.

"(2)   Koch saw something 'hanging across' the road, 'started slowing down,' and knew it was a cable.

"(3)   Koch'[s] and [plaintiff's] version of the events preceding the time when [plaintiff] hit the cable are identical in all material respects. According to Koch, [plaintiff] 'kind of coasted and then turned around and looked *** back at me and then he looked back forward again *** [a]nd then he hit the cable. According to [plaintiff], Koch 'stopped, but I *** continued to go. And I started to accelerate [a] little bit, and I looked back, and he had a shocked look on his face, and I turned back around, cable.' [Plaintiff] testified that because of the shocked look on Koch's face, Koch 'could see that I was going to run into' the cable.

"(4)   Although [plaintiff] only turned around once to look at Koch, when asked if he was looking forward down the road at all other times, he testified, 'actually my eyes are wandering, looking for a sign' indicating where a piece of property was for sale."

Based on those facts, the trial court concluded that, as a matter of law, defendants could not be held liable for plaintiff's injuries. The court noted that the law requires a person driving a motor vehicle to keep a lookout at all times and observed that, "[e]ven without considering the other

respects in which [plaintiff] failed to keep a lookout (by having his eyes 'wander'), at a minimum, it is undisputed [that plaintiff] did not keep a lookout when he turned around to look back at Koch." In the trial court's view, because plaintiff was "driving without looking," he "might as well have been driving blindfolded." The trial court therefore concluded that plaintiff was "100% responsible for his injuries and no reasonable juror could find otherwise," making it unnecessary for the court to consider the other issues that the parties' arguments raised, such as "whether the cable should have been better marked." In effect, as the Court of Appeals majority observed, the trial court concluded from undisputed facts in the summary judgment record that plaintiff's conduct alone was the cause of plaintiff's harm and ruled in favor of defendants on that basis. *Towe*, 246 Or App at 32.[5]

In that regard, the trial court's reasoning is analogous to this court's holding in *Garrison v. Deschutes County*, 334 Or 264, 48 P3d 807 (2002), where we determined that the plaintiff, as a matter of law, was the sole cause-in-fact of his own injuries. The plaintiff in that case fell from a drop-off at the county dump. The drop-off was designed so that people could back their vehicles to a ledge and then throw their refuse over the side directly into semi-truck trailers on a cement slab below. Although a seven-inch high railroad tie was in place to prevent vehicles from backing off the ledge, the county had not put up any kind of barrier to prevent a person from falling over the edge; nor had the county posted a warning of the danger. Plaintiff, however, had backed his pickup to the drop-off several times before and was aware of the importance of being careful to not fall over the side while unloading refuse from his pickup. On the day of his injury, he consciously thought about the danger; indeed, he and his wife, who was with him at the time, discussed the

---

[5] An alternative way to understand the trial court's ruling is that it was based on the comparative negligence of the respective parties. The parties have approached the ruling that way, as did the Court of Appeals dissent. *See Towe*, 246 Or App at 59-61 (Sercombe, J., dissenting). We consider that framing of the trial court's analysis later, after first determining whether the negligence claims against either or both Mountain View and Re/Max fail as a matter of law. A comparative analysis of the relative negligence of the parties is meaningful only after determining whether there are triable issues of fact on one or both of plaintiff's negligence claims against defendants and, if so, the nature of the negligence alleged.

need for him to be careful. Even so, plaintiff fell. *Id.* at 267-68. This court concluded that, as a matter of law, "no causal link [existed] between the county's failure to warn and the injuries that befell [plaintiff]" because the failure to warn "did not expose [plaintiff] to any greater risk than if [he] had been warned." *Id.* at 279. Said another way, the undisputed evidence compelled a conclusion that "no reasonable juror could find that a warning would have made a difference." *Id.*

In much the same way, the trial court reasoned here that no amount of marking or warning of the danger of the cable would have made a difference because plaintiff himself was paying too little attention to the road to notice the cable, however well it could have been marked, or a warning sign if there had been one. In the trial court's view, plaintiff was so remiss in his failure to keep a proper lookout for obstacles in the road ahead of him that plaintiff might as well have been riding "blindfolded."

In so reasoning, however, the trial court gave undue factual significance to plaintiff's testimony about where he was looking as he rode his motorcycle on the access road. The trial court emphasized that plaintiff "turned around to look at Koch." But that overstated the evidence. Plaintiff described his backward look as "[j]ust a glance." When asked to estimate how long he looked back at Koch, plaintiff said "[h]alf a second." Viewed most favorably to plaintiff, he glanced back at Koch for a split second, then immediately returned his eyes to the road ahead.

Similarly, to the extent that the trial court relied on plaintiff's acknowledgement that his eyes were "wandering" from the road ahead to conclude that plaintiff might as well have been "blindfolded," the evidence of the degree to which plaintiff's eyes were wandering does not compel, as a matter of law, that extreme characterization of plaintiff's conduct. Viewing the evidence (again) most favorably to plaintiff, he was intermittently and briefly diverting his eyes to scan the landscape adjacent to the access road. That is all; he did not cease to return his eyes to the road ahead for any extended time.

By viewing plaintiff's conduct as more egregious than a reasonable juror would have to view it, the trial court

drew an undue legal inference from it as well. Contrary to the trial court's conclusion, neither plaintiff's split-second glance backwards nor his scanning of the surrounding landscape, nor the two combined, compels the legal conclusion that plaintiff violated his duty as a motorist to keep a proper lookout as a matter of law. A proper lookout does not require a driver to target his or her gaze on the road ahead and never look elsewhere. To the contrary, keeping a proper lookout may require a driver, at least briefly, to look and pay attention to the area to the side and the rear. Indeed, persons seeking to obtain an Oregon driver license are advised by the state of the importance of being "able to see what is to the front, sides, and rear of your vehicle" and of scanning "the road ahead and to the sides" for potential hazards that a motorist with a fixed forward-view might otherwise not see.[6] The state similarly, but more emphatically, advises persons seeking a motorcyclist endorsement on their Oregon license that safety requires a motorcyclist to "[s]earch *aggressively* ahead, to the sides and behind to avoid potential hazards even before they arise."[7]

---

[6] Driver and Motor Vehicle Services, Or. Dept. of Transp., *2014-2015 Oregon Driver Manual* § 4, 58 (2014-15). The knowledge test required for obtaining a license is based on the information that the Oregon Driver Manual covers. *Id.* at 12. That publication further advises motorists:

"Scanning does not mean looking at the middle of the road. It means taking in the entire scene, including the sides of the road. Scanning the road ahead and to the sides helps you see potential hazards ahead, vehicles that may enter your path, signs warning of a hazard ahead, or signs routing you to another street or road. It also helps keep you awake and alert."

*Id.*; *see generally* Oregon Evidence Code (OEC) 201 (courts may take judicial notice of certain facts).

[7] Driver and Motor Vehicle Services, Or. Dept. of Transp., *2014-2015 Oregon Motorcycle & Moped Manual* § 3.4, 21 (2014-15) (emphasis added). Visual vigilance to avoid hazards from all directions can be even more important for motorcyclists given their vulnerability in an impact of any kind. The Motorcycle Safety Foundation (MSF), a national organization that promotes motorcycle safety through, among other safety activities, state training and licensing programs, warns that impacts with dogs, who like to chase motorcycles, and deer, who wander onto roads unpredictably, are special hazards for motorcyclists. Motorcycle Safety Foundation *Basic Ridercourse® Rider Handbook* 38 (1st ed 2014). Thus, the MSF advises motorcyclists:

"Your eyes should be busy and your mind active. Do not look at (or target-fixate) on any one object for more than a split second. Keep your eyes moving—far and near, side-to-side, including the instrument display and mirror and blind spot checks."

*Id.* at 23; *see generally* OEC 201 (permitting judicial notice).

To be sure, a motorist may become unduly distracted from the road ahead by looking for signs, landmarks, other objects, or hazards to the side or the rear of a path of travel. But the point at which a motorist's "wandering eyes" unreasonably compromises his or her appreciation of hazards in the road ahead will depend on the totality of the circumstances involved. And frequently, assessing what is reasonable in any given set of circumstances will give rise to a jury question. As this court explained in *Pitcher v. Leathers*, 270 Or 666, 671, 529 P2d 381 (1974):

> "Human vision cannot simultaneously comprehend all points of the compass. Accordingly, a motorist is not held as a matter of law to be under a duty to look in a specific direction at a specific time. The standard of lookout required is that of the reasonable motorist under the same or similar circumstances. The determination of what a reasonable person would have done is properly left to the jury unless the court can say without hesitation that no reasonable person would have proceeded as the plaintiff did under all the evidence."

(Internal quotation marks and citations omitted.)

On this record, whether plaintiff's conduct in glancing back at Koch when Koch unexpectedly slowed, or whether plaintiff's conduct in scanning the landscape for a sign marking adjacent properties for sale, was so egregious as to render plaintiff "blind" to the road ahead, in turn making plaintiff the sole cause of the harm that befell him, is a question of fact for a jury's resolution. The evidence does not compel a conclusion adverse to plaintiff as a matter of law. Nor, contrary to Mountain View's suggestion, does the record compel a conclusion (unlike the record in *Garrison*) that better marking the cable or better warning of it would not have mattered given that plaintiff already knew about the cable. In *Garrison*, the plaintiff had testified that he was standing by and consciously aware of the drop-off as he unloaded refuse from his truck. 334 Or at 279. This court therefore concluded that the county's failure to warn the drop-off did not expose the plaintiff to any greater risk of harm. because the plaintiff was already aware of the risk. *Id*.

In this case, in contrast, although plaintiff acknowledged that he had personal knowledge of the cable, he also

said he had forgotten about it, which was consistent with the circumstances of the accident, as well as the rural nature of the road, the infrequency with which plaintiff traveled it, and the disputed evidence of the frequency with which the cable was hung across the road. A reasonable juror therefore could conclude as a factual matter that a better warning could have made a difference in avoiding the injuries that plaintiff suffered. Of course, reasonable jurors might differ on whether plaintiff was negligent to have forgotten about the cable under all the circumstances, but that bears on plaintiff's comparative negligence. Given the evidence that plaintiff had forgotten about the cable, Mountain View's failure to better mark it or warn that it was there could be found by a reasonable juror to have been a cause-in-fact of plaintiff's injuries. For those reasons, the trial court's grant of summary judgment for both Mountain View and Re/Max on the theory that plaintiff's own conduct was the sole cause of his injuries was error.

C.  *Defendants' Conduct as Cause-in-fact of Plaintiff's Injuries*

Our conclusion that plaintiff's conduct was not, as a matter of law, the sole cause-in-fact of his injuries is not a complete answer on the element of causation. For either Re/Max or Mountain View (or both) to ultimately be liable for negligence, each must have engaged in acts or omissions that were a cause-in-fact of plaintiff's injuries. Concluding that plaintiff was not the sole cause of his injuries does not—at least, not necessarily—answer whether the record would support a finding that the conduct of Mountain View or Re/Max did cause those injuries. For that, we need to examine the acts and omissions by Mountain View and Re/Max that plaintiff claims contributed to causing him to ride his motorcycle into the cable.

Mountain View, for its part, does not argue that, if plaintiff is not the sole cause of his injuries as a matter of law, then a question of fact remains as to whether Mountain View's conduct was at least a contributing cause of plaintiff's injuries. Re/Max, however, urges that no reasonable juror could find its conduct to have been a factual cause of plaintiff's injuries. The Court of Appeals majority

and dissent divided on that point. As we will explain, we agree with the Court of Appeals majority, and our agreement is dispositive as to Re/Max's entitlement to summary judgment.

As we earlier described, plaintiff's negligence claim against Re/Max is based on Re/Max's conduct in leaving its directional sign at the base of the access road, while also removing its parcel-specific sign from the Kinyon property, which had marked that as the particular property that was for sale. Under plaintiff's theory, the absence of the second sign caused him to be scanning the adjacent landscape looking for a sign marking property as for sale when he otherwise would not have, which in turn was at least a contributing cause-in-fact (but not the sole cause) of the harm that befell him (*i.e.*, riding his motorcycle into the cable).

The Court of Appeals majority and dissent split on whether the record created a jury question on that issue, because they viewed the factual inferences that the record permits differently. The majority concluded that plaintiff, as a matter of law, cannot establish causation as to Re/Max on this record, reasoning that:

> "Plaintiff did not go up the road to look at the Kinyon property; rather, he testified that he went up the road to look for property that his girlfriend told him was for sale and that he believed to be on Mountain View's road * * *. There is no indication from this record that the presence of the Re/Max sign [at the entrance to the access road] substantially influenced his decision to travel up the access road or that, in the absence of Re/Max's conduct, the accident would not have occurred."

*Towe*, 246 Or App at 40-42. The dissent disagreed, explaining the different view that it took of the record:

> "The evidence was that plaintiff began the biking excursion with the sole purpose of monitoring the mechanical condition of [Koch's] motorcycle. On the way home, plaintiff stopped and looked at the Re/Max sign at the bottom of the access road. Plaintiff testified at his deposition, 'I said, well, might as well go up there and see where there's properties for sale. I'm thinking it's in the vicinity of the same

place [*i.e.*, the Kinyon property that had been previously for sale], but I wasn't sure.'"

*Id.* at 54 (Sercombe, J., dissenting).[8]

On the summary judgment record before us, we agree with the Court of Appeals majority that no reasonable juror could find that Re/Max's conduct in posting a directional sign at the entrance to the access road, alone or in combination with its removal of the second sign on the Kinyon property, caused plaintiff to travel up the access road and to be distracted from seeing the cable. Plaintiff's testimony about why he went up the access road and what property he was looking for was unequivocal—he was trying to find three or four parcels of property that his girlfriend had told him about, ones that he thought, from her description, likely were on the access road on Mountain View's property. In his deposition, plaintiff specifically acknowledged that the sign that had been placed on the Kinyon property was no longer there. Necessarily, then, he knew where the Kinyon property was located along the road. Viewed in the light most favorable to plaintiff, the evidence is that plaintiff was not sure that the parcels that his girlfriend had described were located on Mountain View's portion of the access road, but he thought they were; he also thought they could be somewhere else in the "vicinity" of the Kinyon property. He was not trying to find the Kinyon property, however, and no reasonable inference can be drawn that he was.

Given that undisputed evidence, the fact that Re/Max had removed the sign from the Kinyon property cannot be said to have distracted him. Plaintiff knew that the sign was down; he was not looking for it. He was looking for other properties—"more" properties, as he said—expecting a sign to mark them but not seeing one. Had the Re/Max sign remained on the Kinyon property, the reasonable inference to draw—and the only one—is that plaintiff would have

---

[8] As the Court of Appeals majority correctly observed, two tests for causation potentially apply: the "but for" test and the "substantial factor" test. *Towe*, 246 Or App at 40 (citing cases discussing both tests, including *Joshi v. Providence Health System*, 342 Or 152, 158-62, 149 P3d 1164 (2006)). Both the majority and the dissent, however, thought that the conclusion would be the same regardless of which test applies in assessing whether Re/Max's conduct was a cause-in-fact of plaintiff's injuries. *Id.* at 41 (majority); *id.* at 53 (Sercombe, J., dissenting). We agree.

continued looking for a sign marking other properties that his girlfriend had told him were for sale. Re/Max did nothing to cause plaintiff to believe that other properties were for sale along the access road. That was solely the result of the conversations that plaintiff had with his girlfriend. The directional Re/Max sign at the base of the access road was the same sign that had been there for many months, since the initial listing of the Kinyon property. The sign merely jogged plaintiff's memory (as any "for sale" sign there might have) of his earlier conversation with his girlfriend about additional properties for sale.[9] Remembering the conversation, plaintiff decided to go up the access road to see if he could find the properties that his girlfriend had described.

On that record, we agree with the Court of Appeals majority that, as a matter of law, Re/Max could not be found to have been a cause-in-fact of plaintiff's injuries. Consequently, as the Court of Appeals majority concluded, the trial court's grant of summary judgment to Re/Max was correct on that alternative ground.

D.  *Mountain View's Premises Liability: Was Plaintiff a Trespasser?*

Having concluded that Re/Max was entitled to summary judgment, we turn to Mountain View's remaining arguments that it was entitled to summary judgment. Principal among them is Mountain View's assertion that, as a matter of law, plaintiff was a trespasser on its property at the point at which plaintiff ran into the cable. That argument is important to Mountain View, because, as earlier described, Mountain View's status as an occupier of land, and plaintiff's status as someone injured on that land, invokes special duties of care different from the general "reasonable

---

[9] Worth noting in that regard is that plaintiff did not say—and did not describe his girlfriend as saying—that the properties she had seen for sale were listed by Re/Max. Likewise, he never described himself as looking for a parcel-specific sign posted by Re/Max in particular. His testimony consistently was that he was looking for "a sign" that would indicate to him where the properties that his girlfriend had described were located. Even if plaintiff had testified that he thought those properties would be marked by a Re/Max sign, nothing that Re/Max did could reasonably be the cause of any such belief. Again, by all accounts including plaintiff's own, the directional Re/Max sign that plaintiff observed at the base of the access road was the same one that had been there for the last 11 months and had been posted in connection with the sale of the Kinyon property.

foreseeability" used for ordinary negligence. *See Hagler*, 354 Or at 140-41 (distinguishing general foreseeability principles of *Fazzolari* from special duty that possessors of land have toward invitees to correct unsafe conditions); *Rich v. Tite-Knot Pine Mill*, 245 Or 185, 191-92, 421 P2d 370 (1966) (summarizing differing duties owed by occupier of land to person injured on land depending on injured person's status as licensee, invitee, or trespasser).

As we earlier described, the Court of Appeals majority determined that, as a matter of law, plaintiff was a trespasser on the access road, and Mountain View therefore owed plaintiff only the duty to avoid willful and wanton conduct, rather than to exercise ordinary care. *Towe*, 246 Or App at 38-39; *see generally Rich*, 245 Or at 191 (possessor of land not liable to trespassers for failure to exercise reasonable care to put premises in safe condition); *Monnet v. Ullman et al.*, 129 Or 44, 55, 276 P 244 (1929) (only duty owed to trespasser is to avoid injury as a result of willful or wanton conduct). The Court of Appeals majority concluded that plaintiff had not presented sufficient evidence of willful or wanton conduct to create a jury question on that issue; consequently, as to Mountain View, it affirmed the trial court's grant of summary judgment on that basis. *Towe*, 246 Or App at 39-40.

The dissent, on the other hand, saw the facts as more nuanced. The dissent thought that a jury question existed as to whether the access road was open to public use up to the point where it crossed on to Mountain View's property. *Id.* at 49 (Sercombe, J., dissenting). If a jury were to so conclude, then the fact that plaintiff became a trespasser at the moment that he crossed on to Mountain View's portion of the road did not mean, according to the dissent, that the only duty that Mountain View owed plaintiff was to avoid willful or wanton conduct. Rather, in that circumstance, the dissent would have concluded that Mountain View owed plaintiff a duty of reasonable care. *Id.* (citing *Wolfe v. Union Pacific R. Co.*, 230 Or 119, 124, 368 P2d 622 (1962)).

Insofar as the Court of Appeals majority understood the portion of the access road owned by Mountain View to be private and to be closed to the public, we agree that there

is no factual dispute on that score. Sometime around 2004, Mountain View posted at the entrance to the access road a large sign that identified its quarry (Mountain View Rock). The sign stated "private road" and declared "no trespassing." Plaintiff acknowledged in his deposition that he was personally aware that Mountain View did not want people using "its road" and that he saw the sign as he turned off Indian Creek Road and went up the access road towards the quarry. On that record, the majority concluded that no reasonable juror could find that Mountain View had tacitly invited public use of the road. *Towe*, 246 Or App at 37. We agree. But we further agree with the dissent that the fact that Mountain View's portion of the road was closed to public use is not a complete answer in determining Mountain View's duty to those traveling the road before it crossed onto Mountain View's property.

As to those lower portions of the access road, the record creates a question of fact whether the road, even though a private road, was nevertheless open to public use. As we described earlier, the summary judgment record establishes that the access road was owned by three property owners: the BLM, the owner of the Kinyon property, and Mountain View. The BLM owned the first segment of the access road; the owner of the Kinyon property owned the second segment; and Mountain View owned the third. The evidence bearing on whether the BLM and Kinyon portions of the road were open to public use is sparse. The only possible affirmative evidence that they were *not* open to public use is the sign at the entrance that posted the road as "private" and said "no trespassing." But that sign, which was put up by Rick Matthews of Mountain View, identified only Mountain View and the Clarkes (who resided up the road and owned none of it). The sign was not posted by and did not purport to represent the position of the BLM. Likewise, it was not posted by and did not purport to represent the position of the other owner a portion of the access road—the owner of the Kinyon property.

As opposed to that lack of evidence that the BLM and Kinyon portions of the road were closed to the public, other evidence at least suggests inferentially that they were open for public use. At some point in time, Mountain View

and the Clarkes constructed a gate across the access road near its entrance off Indian Creek Road. The BLM, which owned that portion of the road, prohibited them from closing that gate, however.[10] From that evidence, a reasonable juror could conclude that the BLM portion of the access road was open to the public. There is less evidence, one way or the other, about the status of the next portion of the road, which was owned by the owner of the Kinyon property. But there is no evidence that any owner of that property had ever posted a no trespassing sign on the Kinyon portion of the road or had ever wanted to preclude the public from using it. The property had changed hands at least four times in recent years. One of the most recent owners, Kinyon, held it for investment purposes only. At least a fair inference on this record is that no owner of that property had ever closed the Kinyon portion of the road to public use, and none (as non-resident owners) had reason to.

The only evidence that defendants point to as compelling a conclusion that the access road was closed to the public is the existence of the "no trespassing" sign posted at the road's entrance, together with the fact that plaintiff was aware of that sign. But those facts do not control plaintiff's status. Plaintiff would not be a trespasser along the entire access road merely because some sign, posted by someone, at the entrance of the road said "no trespassing." If, in fact, the BLM and Kinyon portions of the road were open to public use, Mountain View's "no trespassing" sign could not render plaintiff a trespasser while on those portions of the road. And as we have concluded, the record creates a question of fact as to whether the BLM and the Kinyon portions of the access road were open to the public. If that factual issue

_____

[10] The record further establishes that the BLM would have permitted Mountain View and the Clarkes to put up a gate certified by the BLM and use the BLM's locks on it, but that was too complicated for Mountain View and the Clarkes to undertake. Although that evidence might suggest that the BLM was not opposed to closing the road, that is not the only inference that it supports. Rather, Rick Matthews's testimony on the point was that the BLM would not let them "close" their gate, not that it would not let them lock it. At least arguably, the point of the BLM's insistence on a certified gate that could be locked only with BLM locks was so the BLM could control whether and when public use of its portion of the access would be cut off. The fact that the BLM never chose on its own to put up a locked gate is evidence that at least permits an inference that it had no interest in precluding public use of its portion of the access road.

were to be resolved in plaintiff's favor, then plaintiff would not be a trespasser while traveling on the access road up to the point where it crossed onto Mountain View's property.

That conclusion, in turn, would alter the duty of care that Mountain View owed to plaintiff as a person who was traveling the road up to that point. The general rule in that regard has been stated by various authorities. Professors Harper, James, and Gray provide a particularly thorough statement in their treatise on tort law:

> "The occupier of land owes a duty of care to prevent artificial conditions on his land from being unreasonably dangerous to highway travelers. Moreover, if he arranges part of his premises so as to lead people to think that they are part of the highway, for example, by paving part of his land as a continuation of the sidewalk, he comes under a duty of care to keep that part of his land reasonably safe for travelers. \* \* \*
>
> "\* \* \* \* \*
>
> "In all these cases the trespass aspect is not made controlling and the courts are apt to use a straight negligence approach. This means that the duty and its scope depend on foreseeability of harm in all the circumstances. The proximity of the danger to the highway, the extent and character of travel, the past practices of travelers, the seriousness of the danger and the likelihood that it will be seen and avoided, and the physical surroundings of the danger would be among the variable factors entitled to consideration in deciding this cardinal question."

Fowler V. Harper *et al.*, 5 *Harper, James and Gray on Torts* § 27.4, 173-77 (3d ed 2006) (footnotes omitted). The *Restatement (Second) of Torts* § 368 (1965) states a similar rule: A possessor of land near an existing highway is liable for creating an artificial condition that he knows or should know creates an unreasonable risk "to others accidentally brought into contact with such condition while traveling with reasonable care upon the highway."[11]

---

[11] *See also* Dan B. Dobbs, *The Law of Torts, Hornbook Series* § 231, 590 (2000) ("The land occupier owes not only a duty of reasonable care to protect those on the public way from activities and conditions on his land, but also a duty of care to those who foreseeably stray from the road onto the land itself and are injured by a condition such as an excavation that was put there after the road was built. The

We have not before had a case in which we have adopted the common-law rule for the duty owed by a landowner (or other possessor of land) to a person lawfully traveling adjacent to the land.[12] This case, however, implicates that duty, and we agree in general principle with the rule as stated by the authorities above. The duty of a landowner to those who travel adjacent to it is a limited duty of ordinary care, rather than a duty to avoid only willful or wanton conduct, as would be owed to an ordinary trespasser. That duty is premised on the value that society places on the interest in public passage, and it strikes a balance between that interest and a landowner's equally important interest in the exclusive use and enjoyment of his or her own property. *See Prosser & Keeton on the Law of Torts* § 57, 388 (W. Page Keeton ed., 5th ed 1984) (noting public passage rationale for the rule); *Hutchings v. Bauer*, 149 Ill 2d 568, 573-77, 599 NE2d 934, 936-38 (1992) (Freeman, J., specially concurring) (discussing rule as a balance between landowner's interest in unrestricted use and enjoyment and interests of passersby). As aspects of the ordinary care that is owed, the duty typically extends only to artificial conditions on the land.[13] *See, e.g.,*

___

duty of care is owed if the landowner should foresee that a highway user would inadvertently enter the land even if she is exercising due care.").

[12] *Wolfe v. Union Pacific R. Co.*, 230 Or 119, 368 P2d 622 (1962), on which the dissent relied, came close. But it involved the more specific situation of a possessor of land who knows or should know that others will reasonably believe part of that land to be an extension of a public road. This court in *Wolfe* followed the first *Restatement of Torts* § 367 (1934), which imposes a duty on the landowner to exercise reasonable care to maintain that part of the property in a reasonably safe condition for travel. *See also Prosser and Keeton on the Law of Torts* § 57, 389 (W. Page Keeton ed., 5th ed 1984) ("[I]f [a landowner] so maintains a part of his land that it appears to be a highway, as where he paves a strip next to the street, or gives a private way the appearance of a public one, he must use reasonable care to see that there is no danger to those who are misled into using it." (Footnotes omitted.)). The rule that we adopt in this case, while consistent with the rule adopted in *Wolfe*, is not limited to portions of land that reasonably appear to be part of a "public highway" or other road open to public use. Nor would such a rule aid plaintiff in this case. Plaintiff knew that Mountain's View's portion of the road was not open to the public and he knew that Mountain View's portion of the road began at an easily identifiable point—where the gravel ended and the pavement began.

[13] According to at least the *Restatement*, the duty is further limited to artificial conditions that post-date the existence of a publicly used road; if the conditions exist first, and the road comes into existence later, the person charged with maintaining the road has the responsibility to warn travelers of the danger; the duty to warn is not on the occupier of the land who first created the hazard. *Id*. § 368 cmt c. That limitation on premises liability is not implicated here, however,

*Rosengren v. City of Seattle*, 149 Wash App 565, 573-75, 205 P3d 909, 913-14 (2009) (analyzing whether trees planted near sidewalk were natural or artificial hazard). Also, it typically extends only to unreasonably hazardous conditions, not to any danger. *See, e.g.*, *Hutchings*, 149 Ill 2d at 572, 599 NE2d at 936 (assessing whether barrier erected by landowner to protect property from speeding vehicles that left road while rounding curve was unreasonably dangerous). Finally, the duty generally protects those who deviate from the public way onto the private land only to the extent that the deviation is a normal incident of traveling the public way. *Kavanaugh v. Midwest Club, Inc.*, 164 Ill App 3d 213, 218-19, 517 NE2d 656, 659-60 (1987) (discussing incidental deviation requirement; holding that property owner did not have duty to driver who, due to suffering epileptic seizure, deviated from public highway and drove into pond on land).

Although treatises and other sources frequently refer to the duty of a landowner adjacent to a public "highway," no principled reason exists in Oregon to limit that duty to publicly owned roads. Oregon motorists have many of the same legal duties of safe driving whether they drive on a publicly owned road or one that is privately owned but open to public use.[14] Just as motorists when traveling private roads open to the public must abide by laws that protect the safety of persons and property the same as if the road were publicly owned, so too should a landowner adjacent to

---

and we do not decide whether we would adopt it. Mountain View first hung the cable across the road in 2004, about the same time that it placed its "no trespassing" sign at the entrance to the access road. The record does not suggest that there had been any change in the public's use of or permission to use the portions of the road below Mountain View's property. To the contrary, the reason that Mountain View took those actions was because people were traveling the access road all the way to the quarry and some were stealing and vandalizing quarry property.

[14] *See, e.g.*, ORS 801.400 ("premises open to public" includes any premises open to general public for use of motor vehicles, whether publicly or privately owned and regardless if fee is charged for use of premises); ORS 806.010 (requirement of meeting financial responsibility laws applies to any vehicle driven on premises open to public); ORS 807.010 (driver license and permit requirements apply when operating vehicle on premises open to public); ORS 811.125 (speed racing prohibition applies to premises open to public); 811.140 (reckless driving prohibition applies to premises open to public); ORS 813.010 (driving under the influence of intoxicants prohibition applies to any premises open to public); *see also* ORS 811.700 and ORS 811.705 (duties of driver involved in accident that injures person or property apply equally to premises open to public).

a road open to the public have the same duty of care as owed by a landowner to motorists traveling on an adjacent public highway. That is not to say that the private nature of the road is not relevant; it is. The character of the road, its ownership, and the rural or remote nature of the surrounding property (among other factors) legitimately bear on whether a particular hazard is an unreasonable one and the steps that an adjacent landowner reasonably would take to warn of the hazard or reduce its dangerousness. Those and similar factors, however, are relevant to whether the duty of care has been breached, not to whether any duty of care is owed.

Mountain View's arguments emphasize that the access road was a private road, and plaintiff acknowledged that fact. But the significant issue is not whether the access road was privately or publicly *owned*; it is whether the road, although private, was open to public use. It is on that point—not the private ownership of the road—that the evidence is mixed and gives rise to a question of fact for a jury's resolution. The record in this case thus creates a basis on which a trier of fact could find that Mountain View owed plaintiff, and other persons traveling the access road up to the point where Mountain View's property began, a duty of ordinary care. As we have concluded, a question of fact exists on whether the access road, although private, was open to the public until the road reached Mountain View's property. If the factfinder were to so find, then it would follow that plaintiff was lawfully traveling those portions of the access road. At the point that the access road crossed onto Mountain View's property, the road was under Mountain View's ownership. Mountain View was entitled to close its portion of the road to the public, and the undisputed evidence in the summary judgment record is that Mountain View had done so and plaintiff was aware of that fact. In doing so, however, Mountain View had a duty of ordinary care to those lawfully traveling the road up to the point where it was off-limits to the public. That duty was to not create or maintain an artificial condition that posed an unreasonable risk to anyone who might incidentally cross onto Mountain View's land while negotiating the publicly accessible portion of the access road. *See, e.g., Cook v. Nashville, C. & St. L. Ry. Co.*, 45 Ga App 695, 165 SE 760, 761 (1932) (landowner railway owed ordinary duty

of care to travelers on road where it knowingly maintained large unfenced excavation on property abutting end of road and driver ran into excavation at night when hazard was not visible).[15]

Put simply, motorists traveling the lower portion of the access road had to stop at Mountain View's property. But if those motorists were lawfully traveling the portions of the access road before Mountain View's property, Mountain View had to give them a reasonable opportunity to stop and not erect an unreasonably dangerous barrier that they might incidentally encounter before they could do so. Because a jury question existed as to whether the lower portions of the road were open to public use, Mountain View was not entitled to summary judgment on the theory that the only duty that it owed plaintiff was the duty to avoid willful or wanton conduct.[16]

---

[15] Worth noting is this observation by Professor Dobbs:

"[T]he risk must be one to travelers who are reasonably careful. [The rule does not require] that the plaintiff must herself be without fault in the particular instance if the risk would also be one to reasonably careful people. The fault of the actual plaintiff would thus become a matter of contributory [or comparative] negligence, not a matter of the defendant's duty. It is easy to miss the distinction, and some authority holds that the defendant is under no duty to one who is actually at fault, even if the land's condition was a threat to persons who were faultless as well. But no matter what, harm to someone must be foreseeable and on that point the danger's distance from the road is highly relevant. A utility pole at the road's edge is a great danger even when it is obvious, while a hidden excavation 100 yards from the road is not."

"The occupier's duty of care may extend in some cases to persons who intentionally enter the land either out of necessity or because the land appears to be a part of the public way, so long as risk to such persons is foreseeable."

Dobbs, *The Law of Torts, Hornbook Series* § 231, 590-91 (footnotes omitted).

Thus, in this case, the fact that plaintiff's own negligence may have contributed to his injuries (which plaintiff concedes a reasonable juror could find) does not mean that Mountain View owed no duty of ordinary care to him. That duty depends on how the disputed facts are resolved as to whether the road was open to public use up to the point that it crossed onto Mountain View's property. Plaintiff's negligence, instead, bears on the comparison of the parties' respective negligence. On the other hand, if a jury determines that the cable across the access road was not unreasonably dangerous to a reasonably careful person traveling towards it, then plaintiff cannot prevail as to Mountain View—not because of plaintiff's own negligence, but because Mountain View would not have breached its duty to plaintiff.

[16] We do not proceed to the parties' related arguments about whether Mountain View's conduct as a matter of law was not willful or wanton, which is an issue on which the Court of Appeals majority and dissent divided. Whether that issue will arise in this case depends on whether, in resolving the disputed

E.   *Mountain View's Alternative Theory: No Negligence as a Matter of Law*

Mountain View alternatively argues that no reasonable juror could find that it had been negligent, even assuming that its conduct is tested under ordinary negligence standards. We understand Mountain View's argument to be that its actions either did not create a foreseeable risk of harm or that its actions were not unreasonable in light of that risk. Although this case potentially presents close facts, we disagree. The record here suggests—and a reasonable juror could find—that Mountain View hung the cable across its road close to its boundary line with no advance sign warning that the boundary was approaching. Rather, a motorist's awareness of his or her obligation to stop and go no farther depended on seeing the cable, and perhaps also the "no trespassing" sign that sometimes hung from it, but that frequently fell off. The evidence in the summary judgment record about the cable's visibility and appearance is mixed. Whether the cable was sufficiently well marked to be seen by an approaching motorist, thus permitting a reasonably careful motorist to both stop and avoid the hazard before crossing onto Mountain View's land, are factual questions for a jury to resolve. *Cf. Wolfe*, 230 Or at 124-25 (where reasonable juror could conclude that railway had not given notice that road onto property was private, so that motorist reasonably would have regarded road as integral part of public highway system, railway had duty to warn motorist of dangerous curve on road or otherwise protect them from the danger).

On the record before us, a reasonable juror might find that Mountain View had created a foreseeable risk of injury because it erected an insufficiently marked cable that would be a hazard to persons travelling on the road. Furthermore, a reasonable juror might also conclude that Mountain View's actions were unreasonable in light of the risk to travelers on the road: Mountain View did not control

---

evidence, a finder of fact determines that plaintiff was a trespasser on the BLM and Kinyon property portions of the access road. Moreover, because the case must be remanded for further proceedings, the limited summary judgment record now before us is not the record on which the willful or wanton nature of Mountain View's conduct, if it becomes relevant, likely will be resolved.

the road below its property, and so it had to expect that the owners of the lower sections of road would allow or invite others to travel on the road, thus exposing those travelers to the dangers of deviating onto its portion of the road before they could see the inadequately marked cable and stop to avoid it.[17] On this record, then, Mountain View was not entitled to summary judgment on the basis that a jury, as a matter of law, could not find Mountain View to have maintained an unreasonably dangerous condition that injured plaintiff.

## F. *Comparative Negligence*

As we earlier alluded to, the trial court ruling in this case may be understood to have reasoned that defendants were entitled to summary judgment because plaintiff was not entitled to recover under comparative negligence principles. 357 Or at 89 n 5. Plaintiff does not dispute that a jury could find that he was negligent in his actions that led to the accident and that he therefore could be found to have been at least partially at fault. His position, however, is that defendants were negligent as well, that their negligence contributed to his injuries, and that whether plaintiff's negligence exceeded that of defendants', thus barring plaintiff's recovery, is a question of fact for the jury. As we have concluded, Re/Max is entitled to summary judgment because its conduct, as a matter of law, was not a cause-in-fact of plaintiff's injuries. Therefore, the comparison to be made is that of Mountain View's potential negligence as compared to plaintiff's own. Before examining whether the record on summary judgment gives rise to a material issue of fact in that regard, we first briefly trace the development of the doctrine of comparative negligence in Oregon.

For many years, Oregon embraced the doctrine of contributory—rather than comparative—negligence. Under

---

[17] Mountain View suggests that it was not foreseeable that the cable would injure a former employee who knew about the cable and who was distracted while travelling down the road. That argument misunderstands foreseeable risk. In negligence cases, the foreseeable risk is the "generalized risk of the types of incidents and injuries that occurred rather than the predictability of the actual sequence of events." *Fazzolari*, 303 Or at 13. The question of this particular plaintiff's responsibility for the accident is more appropriately dealt with, as we discussed earlier, in analyzing whether plaintiff was the "sole cause" of his injuries and, as we discuss in the next section, in assessing plaintiff's comparative negligence.

the contributory negligence doctrine, any negligence by a plaintiff was a complete bar to the plaintiff's ability to recover damages from a defendant who was also at fault, regardless of the degree of the plaintiff's or the defendant's negligence. *See Maser v. Klein*, 224 Or 300, 304, 356 P2d 151 (1960), *overruled in part on other grounds by Godell v. Johnson*, 244 Or 587, 592 n 8, 418 P2d 505 (1966) ("Contributory negligence, briefly stated, is any negligence alleged against the plaintiff which contributes as a proximate cause of the accident. \*\*\* If it contributes in any degree as the proximate cause of the accident and injuries, that is sufficient to bar recovery on the part of the plaintiff.").

In 1971, the legislature abandoned contributory negligence and adopted the doctrine of comparative negligence in its stead. Or Laws 1971, ch 668, § 1 (codified as ORS 31.600). In particular, the legislature provided that the respective negligence of a plaintiff and one or more defendants are to be compared to determine whether and to what extent the plaintiff might nevertheless recover damages from the defendant. Under that approach, a plaintiff's negligence results in reducing the damages that the plaintiff can recover, rather than barring any recovery, as long as the plaintiff is not more responsible for the injuries than all other actors combined. *See generally Eclectic Investment, LLC v. Patterson*, 357 Or 25, 35-36, ___ P3d ___ (2015) (describing statutory change). Specifically, ORS 31.600 provides, in part:

> "(1)   Contributory negligence shall not bar recovery in an action by any person or the legal representative of the person to recover damages for death or injury to person or property if the fault attributable to the claimant was not greater than the combined fault of all persons specified in subsection (2) of this section, but any damages allowed shall be diminished in the proportion to the percentage of fault attributable to the claimant."

As we earlier described, the trial court in this case concluded that plaintiff was "100% responsible" for his injuries because he failed to keep a proper lookout while driving his motorcycle. Plaintiff and Mountain View both assume that, in granting summary judgment on that basis, the trial court determined that plaintiff's negligence exceeded

Mountain View's and Re/Max's combined negligence as a matter of law, which legally made plaintiff solely responsible (*i.e.*, 100 percent responsible) for his injuries because, under the comparative negligence statute, his greater negligence was a complete bar to recovery.

We agree with plaintiff that, if that was the trial court's rationale, the trial court erred. The apportionment of negligence as between multiple negligent actors is, ordinarily, a question for a jury. *See Jordan v. Coos-Curry Elec. Coop.*, 267 Or 164, 165, 515 P2d 913, *on reh'g*, 516 P2d 472 (1973) ("Generally, the apportionment of negligence [in comparative negligence] is for the jury and will not be upset except where it is manifest as a matter of law that the allocation is unreasonably disproportionate." (Internal quotation marks and citation omitted.)); *see also Resser v. Boise-Cascade Corp.*, 284 Or 385, 391 n 4, 587 P2d 80 (1978) (citing with approval observation that comparative negligence doctrine, given its very nature, lends itself even less frequently to resolution as a matter of law than did contributory negligence rule). The record in this case does not make it an exception to that usual rule. Determining fault and the respective proportions of fault in this case is a fact-intensive assessment that would require weighing, among other considerations, whether plaintiff should have remembered the cable, how much attention plaintiff was paying to the road and surrounding hazards, how well Mountain View marked and warned of the cable, and how well Mountain View should have marked and warned of the cable, given the frequency or infrequency of travel on the road and the rural nature of the area. We cannot say that plaintiff's negligence exceeded that of Mountain View as a matter of law; the task of apportioning negligence between plaintiff and Mountain View should be left to the jury.

## IV.   CONCLUSION

For the reasons that we have discussed above, the trial court erred in granting summary judgment to both defendants on the ground that plaintiff was the sole cause of his injuries. Although a jury could conclude on this record that plaintiff was not riding his motorcycle as safely as he could have or should have, the nature of his conduct was

not such that the only reasonable conclusion is that plaintiff would have driven into the cable despite any negligence on either Mountain View's or Re/Max's part.

Re/Max is, however, entitled to summary judgment on the alternative ground identified by the Court of Appeals majority—*viz.*, lack of evidence of cause-in-fact. Plaintiff's testimony established that he knew where the Kinyon property was, observed that Re/Max's "for sale" sign was no longer on it, and was looking for other property that he thought, based on a conversation with his girlfriend, was for sale in the same vicinity, probably adjacent to Mountain View's portion of the access road. On the record before us, a reasonable juror could not find, as plaintiff alleged, that Re/Max's conduct in leaving its directional sign on the entrance to the access road and removing the "for sale" sign from the Kinyon property actually caused plaintiff to travel up the access road, be distracted, and ride into the cable.

The record does, however, give rise to questions of fact that preclude summary judgment in favor of Mountain View. Contrary to the conclusion reached by the Court of Appeals majority, the summary judgment record does not compel a conclusion that plaintiff was a trespasser as a matter of law to whom Mountain View owed only a narrow duty to avoid wanton conduct. A disputed factual issue exists as to whether the access road below Mountain View's property— that is, the portions owned by the BLM and the owner of the Kinyon property—were open for public use. If that factual issue is resolved in plaintiff's favor, then Mountain View owed plaintiff and other members of the public traveling on the road adjacent to his property a duty not to create or maintain an artificial condition that posed an unreasonable risk of harm to those who might reasonably deviate from the public way onto Mountain View's property. Whether Mountain View violated that duty is a jury question—reasonable minds might differ on the point, depending on how a jury resolves questions about how the cable was marked, the consistency with which it was placed across the road, the rural character of the area, and other circumstances that would bear on Mountain View's reasonableness. Finally, Mountain View was not entitled to summary judgment on the ground

that plaintiff was comparatively more negligent. That determination is ordinarily one for the jury, and the record in this case does not provide reason to deviate from that usual rule. Accordingly, the trial court correctly granted summary judgment to Re/Max and erred in granting summary judgment to Mountain View.

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court for further proceedings.