No. 55 August 11, 2016 211

IN THE SUPREME COURT OF THE
STATE OF OREGON

Jan WYERS,
as Personal Representative of the Estate of
Dianne Terpening, Deceased,
*Respondent on Review,*

*v.*

AMERICAN MEDICAL RESPONSE NORTHWEST, INC.,
an Oregon corporation,
*Petitioner on Review.*

091014750; CA A149258 (Control)


Hazel CORNING,
*Respondent on Review,*

*v.*

AMERICAN MEDICAL RESPONSE NORTHWEST, INC.,
an Oregon corporation,
*Petitioner on Review.*

091116570; A149259


Violet ASBURY,
*Respondent on Review,*

*v.*

AMERICAN MEDICAL RESPONSE NORTHWEST, INC.,
an Oregon corporation,
*Petitioner on Review.*

091116571; CA A149260


Stacey WEBB,
*Respondent on Review,*

*v.*

AMERICAN MEDICAL RESPONSE NORTHWEST, INC.,
an Oregon corporation,
*Petitioner on Review.*

091116572; CA A149261

Michele SHAFTEL,
*Respondent on Review,*

*v.*

AMERICAN MEDICAL RESPONSE NORTHWEST, INC.,
an Oregon corporation,
*Petitioner on Review.*

091216650; CA A149262

Natsue AKRE,
*Respondent on Review,*

*v.*

AMERICAN MEDICAL RESPONSE NORTHWEST, INC.,
an Oregon corporation,
*Petitioner on Review.*

100202934; CA A149263
(SC S063000)

On review from the Court of Appeals.*

Argued and submitted November 9, 2015.

Michael J. Estok, Lindsay Hart, LLP, Portland, argued the cause and filed the briefs for petitioner on review. With him on the briefs was James L. Dumas, Lindsay Hart, LLP, Portland.

Mark McDougal and Gregory Kafoury, Kafoury & McDougal, Portland, argued the cause and filed the briefs for respondents on review.

Lindsey H. Hughes, Keating Jones Hughes, P.C., Portland, filed the brief for *amicus curiae* Oregon Association of Defense Counsel.

Erin K. Olson, Law Office of Erin Olson, P.C., Portland, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

Before Balmer, Chief Justice, and Kistler, Walters, Landau, Baldwin, and Brewer, Justices.**

_____

   * Appeal from Multnomah County Circuit Court, Kathleen M. Dailey, Judge. 268 Or App 232, 342 P3d 129 (2014).

   ** Linder, J., retired December 31, 2015, and did not participate in the decision of this case. Nakamoto, J., did not participate in the consideration or decision of this case.

LANDAU, J.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**LANDAU, J.**

This consolidated appeal concerns six civil actions against an ambulance company for permitting a paramedic in its employ to sexually abuse women while they were patients. The claims are alleged under ORS 124.100(5), which authorizes a vulnerable person to bring an action against a person who "permit[s]" another person to engage in physical or financial abuse "if the person knowingly acts or fails to act under circumstances in which a reasonable person should have known" of the abuse. The ambulance company moved for summary judgment on the ground that there was no evidence that it actually knew of its paramedic's abuse against plaintiffs and then acted in a way that permitted that abuse to occur. The trial court agreed and granted the motion. The Court of Appeals reversed, concluding that the statute does not require actual knowledge of a plaintiff's abuse. *Wyers v. American Medical Response Northwest, Inc.*, 268 Or App 232, 342 P3d 129 (2014). For the reasons that follow, we affirm the decision of the Court of Appeals and reverse the judgment of the trial court.

## I.    BACKGROUND

Because the trial court granted a defense motion for summary judgment, we state the facts in the light most favorable to plaintiffs. *Shell v. Schollander Companies, Inc.*, 358 Or 552, 554 n 1, 369 P3d 1101 (2016). Defendant American Medical Response Northwest, Inc., (AMR) provides ambulance and other medical transportation services. AMR employed Haszard as a paramedic. This case arises out of multiple allegations of sexual abuse by Haszard of patients while they were being transported in AMR ambulances.

### A.    *The Herring Litigation*

In late 2007, AMR transported a female patient, Herring, to a hospital. During Herring's transport, Haszard placed his hand on Herring's hand and shoved their hands down inside the front of her pants. Later at the hospital, Herring screamed to staff about the incident, which prompted a call to AMR. An employee of AMR's spoke with Herring at the hospital and later called police to report that Herring wanted to make a complaint about ambulance staff.

Police responded and, as part of their investigation, discovered in their database a prior complaint about Haszard.

Three days later, police arrested Haszard. The arrest resulted in publicity, which prompted other women to come forward and report similar incidents to the authorities. Haszard was eventually charged with various crimes and pled guilty to attempted first-degree sexual abuse as to four women. Not long after the Herring incident, Herring and a number of other former patients filed individual common-law battery and negligence actions against both Haszard and AMR. Herring eventually obtained a jury verdict in her favor. *See Herring v. American Medical Response Northwest*, 255 Or App 315, 327, 297 P3d 9 (2013) (affirming judgment), and the other former patients settled.

B.  *Discovery of Earlier Incidents of Abuse*

As part of pretrial discovery in the Herring litigation, other former patients were contacted and interviewed about their ambulance transport experiences with AMR in general and with Haszard in particular. That process revealed that additional women—including the six plaintiffs in this case—had been inappropriately touched by Haszard during ambulance transport.

1.  *Spain*

The first incident occurred in February 2006 and involved Spain, who awoke from unconsciousness in the back of an AMR ambulance to find Haszard pressing her hand on his crotch and rocking back and forth. She later called a business number for AMR and told the receptionist that the paramedic was a "freak" who had inappropriately touched her, that it was unsafe for that paramedic to transport little girls, and that he should be taken off ambulance duty. When asked, the receptionist declined to provide Spain with the paramedic's name. Spain's sister witnessed the phone call and later recalled that Spain had told her that the receptionist had hung up on Spain.

AMR, which had in place a regular process for handling ambulance staff complaints, had no record of the telephone call from Spain.

### 2. *Whalen*

A month later, in March 2006, AMR sent customers a survey. One of those customers, Whalen, reported in her survey that Haszard had failed to respect her privacy at the hospital by not looking away while a nursing assistant helped her into a gown, despite her obvious discomfort. One of AMR's supervisors investigated the complaint by interviewing both Whalen and Haszard. During that interview, Whalen told the supervisor that Haszard had stared at her and acted sexually aroused, but she made no complaint about any unwanted touching. She later recalled that the supervisor had "dismissed everything that [she had] said," telling her that she "must have been imagining things." The supervisor, however, did write an internal report recounting Whalen's complaint that Haszard had not shown sufficient consideration for her privacy and concluding that Whalen's complaint had been "substantiated."

### 3. *Plaintiff Akre*

In April 2006, Akre was transported by an AMR ambulance attended by Haszard. She had trouble breathing, was choking, and feared for her life. During her transport, Haszard repeatedly brushed her bare chest while placing leads on her. She was afraid to tell Haszard to stop, because she thought that Haszard would harm her. She did not report the incident to AMR or to anyone else.

### 4. *Rotting*

In December 2006, Rotting was transported by AMR ambulance with Haszard attending. During the transport, Haszard touched Rotting in a manner similar to the sexual touching that plaintiff Akre had described. He also slowly stroked Rotting's thigh. Rotting reported the incident to a nurse and to family members. Her son called AMR and spoke with the same supervisor who had investigated the Whalen complaint. The supervisor then called Rotting and told her that there would be an investigation. The investigation, however, was limited to interviewing Haszard, who denied having engaged in any inappropriate conduct. Rotting's son later called AMR again, this time stating that the police should be involved. AMR took no further action,

although its risk management department was internally notified that Rotting might file a complaint.

### 5.  *Plaintiffs Shaftel, Asbury, and Terpening*

In January 2007, plaintiff Shaftel was transported by AMR ambulance, attended by Haszard. While Shaftel went in and out of consciousness in the ambulance, Haszard repeatedly touched her bare chest. About three weeks later, plaintiff Asbury, age 73, also was sexually touched by Haszard during an ambulance transport. And three weeks after that, plaintiff Terpening, who was hearing impaired, was also.[1] None of those three women reported Haszard's conduct to AMR, the police, or hospital staff.

### 6.  *Pries*

In March 2007, Pries reported to police that Haszard had sexually abused her during an ambulance transport by taking her hand, placing it inside her pants, and manipulating it. Police spoke with an AMR supervisor about the incident. Several AMR employees, including Haszard, then met with a company risk-management official. AMR ultimately determined that it could not substantiate Pries's allegations, but it warned Haszard in writing that either that incident or the earlier Rotting incident would be reopened if more information came to light. AMR did not make any effort to contact Pries, did not request any further information from the police, and did not tell police about the Rotting complaint from the previous year.

### 7.  *Plaintiffs Webb and Corning*

In April 2007, Haszard sexually touched plaintiff Webb during an ambulance transport, while she went in and out of consciousness. Four months after that, Haszard also sexually touched plaintiff Corning, then 86, during a transport. Neither plaintiff Webb nor plaintiff Corning reported the incidents to AMR, and the company did not learn about them until discovery in the Herring litigation.

### C.  *Initiation and Disposition Below of Plaintiffs' Claims*

Plaintiffs Akre, Shaftel, Asbury, Terpening, Webb, and Corning individually brought civil actions against AMR

---

[1] Terpening is now deceased. Plaintiff Wyers serves as the personal representative of her estate.

for permitting another person—Haszard—to sexually abuse them, in violation of ORS 124.100. Each of their complaints alleged that AMR knew or had reason to know that Haszard had physically abused ill or injured female patients in the past and that he was likely to do so in the future if allowed to be alone with them in the back of an ambulance. Their complaints further alleged that AMR nonetheless directed Haszard to continue to work in those circumstances, resulting in their abuse. The six cases were consolidated for trial.

AMR moved for summary judgment, arguing that, to establish liability under ORS 124.100(5), plaintiffs must produce evidence that it either participated in or knowingly permitted Haszard to commit the specific acts of abuse that were the bases for plaintiffs' claims. In this case, AMR argued, it is undisputed that it had no knowledge of any of those acts of abuse before they occurred. Plaintiffs responded that ORS 124.100(5) does not require proof of actual knowledge of their abuse. They argued that, instead, the statute requires only that AMR acted or failed to act when it should have known that such abuse was likely to occur and that, in light of earlier complaints about Haszard, AMR should have known that he was likely to abuse them.

The trial court agreed with AMR, concluding that the statute requires proof that AMR "had knowledge of the specific abuse that *** Haszard allegedly committed on each [p]laintiff." Finding an absence of evidence that AMR had been aware of Haszard's abuse of plaintiffs until long after that abuse had occurred, the court granted AMR's motion for summary judgment and dismissed plaintiffs' claims.

Plaintiffs appealed, and the Court of Appeals reversed. *Wyers,* 268 Or App at 255. That court reasoned that ORS 124.100(5) did not require plaintiffs to establish that AMR subjectively knew that Haszard was engaging in misconduct with plaintiffs at the time that that misconduct was occurring. *Id.* at 246-47. Rather, that statute required only that AMR "have knowledge of facts establishing that it knew of the substantial risk of the abuse actually suffered." *Id.* at 247. The court ultimately concluded that a defendant "permit[s]" the abuse at issue if the defendant either "acted or failed to act with knowledge that would lead a reasonable

person to conclude that the plaintiff was being abused or would likely be abused in the manner alleged by the plaintiff." *Id*. Applying that standard to this case, the court determined that plaintiffs had presented "sufficient evidence from which a reasonable juror could find that [AMR had] 'permitted' Haszard to sexually abuse plaintiffs." *Id*. at 255. We allowed review to address the parties' arguments about the meaning of the requirements set out in ORS 124.100(5).

## II.   ANALYSIS

### A.   *Interpretation of ORS 124.100(5)*

ORS 124.100 through ORS 124.140 set out a framework that creates a civil action for abuse of a vulnerable person. ORS 124.100(2) provides:

> "A vulnerable person who suffers injury, damage or death by reason of physical abuse or financial abuse may bring an action against any person who has caused the physical or financial abuse or who has permitted another person to engage in physical or financial abuse."

A "vulnerable person" is a person who is elderly, financially incapable, or incapacitated, or, in certain circumstances, has a disability.[2] ORS 124.100(1)(e). "Physical abuse," for the purpose of the statute, includes sexual abuse. ORS 124.105(1)(e)-(h).

ORS 124.100(5) identifies the particular requirements for bringing an action for permitting another to engage in physical or financial abuse:

> "An action may be brought under this section against a person for permitting another person to engage in physical or financial abuse if the person knowingly acts or fails to act under circumstances in which a reasonable person should have known of the physical or financial abuse."

By its terms, that statute refers both to a requirement that the defendant "knowingly" act and that the defendant do so under circumstances in which a reasonable person "should have known" of the abuse. Not surprisingly, the parties seize

---

[2]  AMR does not dispute that plaintiffs were "vulnerable persons" within the meaning of the statute.

on one of those two references to the virtual exclusion of the other.

AMR highlights the reference to "knowing[]" action or inaction, and argues that "ORS 124.100(5) requires proof that the defendant engaged in 'knowing' and 'intentional' misconduct." AMR briefly acknowledges the subsequent statutory reference to what a reasonable defendant "should have known," but asserts that it "cannot *undo* the actual knowledge requirement stated earlier." (Emphasis in original.) AMR attempts to reconcile the apparent conflict by reading the statute to require actual knowledge of the *conduct* that constitutes the abuse while perhaps not actually knowing—but in circumstances in which it should have known—that the conduct constituted a crime qualifying as abuse within the meaning of the statute.

Plaintiffs highlight the reference to what a defendant "should have known" in ORS 124.100(5), arguing that liability depends on proof that a reasonable person merely "should have known" of the abuse. In plaintiffs' view, AMR's reading of that phrase is nonsensical—citing by way of example evidence that a defendant permitted another to commit such abusive acts as rape and sodomy under circumstances in which the defendant, while perhaps not actually knowing that those acts are prohibited forms of abuse, nevertheless should have known that fact. At the same time, plaintiffs not once in their brief explain the significance of the statute's reference to "knowingly act[] or fail[] to act."

We are thus confronted with an issue of statutory construction, requiring us to determine the meaning of the statute that the legislature most likely intended, based on an examination of its text in context, legislative history, and pertinent rules of construction. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). We begin with the text of the statute, which as we have noted authorizes an action against a defendant who has permitted abuse of a vulnerable person if the defendant "knowingly acts or fails to act under circumstances in which a reasonable person should have known of the *** abuse." ORS 124.100(5). The statute sets out two different mental states—one that appears to refer to actual knowledge and the other that refers to constructive

knowledge. It is an awkwardly phrased bit of drafting, to say the least. And the parties' difficulty in reconciling the two is understandable. We cannot, however, pick one mental state and ignore the other, as the parties effectively propose. We are obligated to take a statute as we find it and give effect to all of it, if possible. *See, e.g.*, *Force v. Dept. of Rev.*, 350 Or 179, 190, 350 P3d 139 (2011) ("Statutory provisions, however, must be construed, if possible, in a manner that will give effect to all of them." (Internal quotation marks omitted.)); *see also* ORS 174.010 ("[W]here there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all.").

In this case, the key to complying with that obligation lies in recognizing that statutory references to culpable mental states always refer to an object; said another way, a mental state is always "directed toward something." *State v. Crosby*, 342 Or 419, 428, 154 P3d 97 (2007). That "something" to which a mental state is directed may be particular *conduct*, or it may be the *circumstances* in which conduct occurs, or it may be a particular *result*. *Id.* at 428-29. Knowledge as to conduct, for example, can refer to an awareness of a bodily movement or knowledge of the essential character of an act, as when a criminal statute requires proof of knowledge of the "assaultive nature" of a defendant's conduct. *State v. Barnes*, 329 Or 327, 337-38, 986 P2d 1160 (1999). In contrast, knowledge as to circumstances can refer to awareness of particular facts while prohibited conduct is being committed, as, for example, a criminal statute requiring proof of knowledge of the age of the person to whom a defendant has sold drugs. *State v. Blanton*, 284 Or 591, 593, 588 P2d 28 (1978).

ORS 124.100(5) does refer to two different mental states. But the object of each of those references to a mental state is significantly different. First, the statute requires proof that a defendant "knowingly act[ed] or fail[ed] to act." In that phrase, the adverb "knowingly" modifies *conduct*, namely, acting or failing to act. It does not refer to knowledge of particular circumstances. Nor does it refer to knowledge of any particular result. It refers to the quality of the defendant's conduct—"knowing[]," as opposed to accidental, reckless, or something else.

To be sure, the particular "act[]" or "fail[ure] to act" that the defendant must "knowingly" commit is conduct that "permit[s]" another person to engage in prohibited abuse. ORS 124.100(5). AMR argues that the use of the term "permit" necessarily implies that the one doing the permitting must have actual knowledge of the conduct that has been permitted. It is not an unreasonable argument. In ordinary usage, the word "permit" can be used to connote active authorization. *Webster's*, for example, lists among its definitions of the verb "to consent to expressly or formally *** to give (a person) leave," *Webster's Third New Int'l Dictionary* 1683 (unabridged ed 2002), suggesting that the actor has full knowledge of what is being permitted.

But AMR's reliance on that definition of the word "permit" is unavailing for several reasons. First, ORS 124.100(5) itself does not say that a defendant must "knowingly permit" abuse to occur. Rather, the word "knowingly" modifies "acts or fails to act." Second, the ordinary meaning of the word "permit" is not necessarily as narrow as AMR suggests. In common usage, the word "permit" is also used to refer to an act or failure to act that has the effect of making something possible, without mention of intention as to the result. *Webster's*, for example, also provides that "permit" can mean "to make possible[;] *** to give an opportunity." *Id.*; *see also American Heritage Dictionary of the English Language* 1315 (5th ed 2011) ("[t]o afford opportunity or possibility"). Third, the effect of AMR's reading is to create the sort of conflict between mental state requirements that we have just noted that we are obligated to avoid, if possible. If the statute requires a defendant to have knowledge of the facts or circumstances of the abuse, then the later reference to a requirement that a reasonable defendant "should have known" of those very facts or circumstances makes no sense. *See also generally Moore v. Willis*, 307 Or 254, 259, 767 P2d 62 (1988) (allegation that person knew something is different from allegation that person "should have known" something; former amounts to ultimate fact, but latter requires judgment about particular set of circumstances from which conclusions must be drawn).

Taking ORS 124.100(5) as it is written, it states that what a defendant must know is the character or nature

of the defendant's act or failure to act. That act or failure to act must have the effect of permitting abuse to occur. But the effect of that act or failure to act of permitting abuse is a result, actual knowledge of which the statute does not require.

We turn, then, to the requirement that the defendant have acted or failed to act "under circumstances in which a reasonable person should have known of the physical or financial abuse." ORS 124.100(5). The wording of that requirement leads to several observations. First, the reference to circumstances in which "a reasonable person should have known" unambiguously sets out a constructive knowledge requirement. That is, ORS 124.100(5) applies under circumstances in which a reasonable person should have known of another's abuse, regardless of whether the defendant actually knew of the abuse. *Cf.*, *Gaston v. Parsons*, 318 Or 247, 266, 864 P2d 1319 (1994) (Peterson, J., dissenting) ("constructive knowledge" of harm refers to when, "in the exercise of reasonable care," it should have been discovered even if not actually discovered); *Forest Grove Brick v. Strickland*, 277 Or 81, 86, 559 P2d 502 (1977) ("constructive knowledge" refers to a person "charged with knowledge that a reasonably diligent inquiry would disclose" (internal quotation marks omitted)). Second, the statute appears to assume that the "circumstances" themselves are known or available to the reasonable person. Thus, ORS 124.100(5) provides that, based on circumstances that are known to a reasonable person, certain other facts perhaps not actually known will nevertheless be imputed, because a reasonable person aware of those circumstances should have known of the abuse. Third, what a reasonable person should have known is "the physical or financial abuse." In contrast to the first mental state requirement, then, the second one clearly refers to constructive awareness of a particular *fact*— another person's physical or financial abuse—not awareness of the defendant's own conduct.

There remains an issue concerning what ORS 124.100(5) means when it refers to "the physical or financial abuse" that a reasonable person should have known. On the one hand, the use of the definite article "the" in reference to "physical or financial abuse" could refer to the specific

incident or incidents of abuse that the defendant allegedly has permitted another to commit against the plaintiff or plaintiffs. On the other hand, it could refer more generally to the *type* of abuse that the defendant has permitted another to commit, whether against the plaintiff or against another vulnerable person.

AMR argues for the former interpretation. In its view, ORS 124.100(5) applies only under circumstances in which it can be demonstrated that it should have known of "the very same incident of abuse that injured the plaintiff." In fact, AMR goes even further and contends that the reference to "the" abuse in ORS 124.100(5) has the effect of transforming a statute requiring constructive knowledge of abuse to one requiring *actual* knowledge of that abuse. In AMR's view,

> "the constructive knowledge requirement in ORS 124.100(5) is necessarily limited to knowledge of *the abuse that occurred on the particular plaintiff.* In other words, the defendant must have some degree of actual knowledge of the abuse on the plaintiff."

(Emphasis in original.)

AMR's contention that the requirement that a defendant reasonably should have known of "the" abuse amounts to a requirement that the defendant have actually known of that abuse is squarely contradicted by the statute's explicit reference to constructive—not actual—knowledge. But that does not completely resolve the matter. ORS 124.100(5) does refer to constructive knowledge of "the" abuse, and AMR's broader suggestion that the phrasing could be taken to refer to constructive knowledge of a specific instance or instances of abuse against the plaintiff or plaintiffs is not unreasonable. This court, after all, has not infrequently declared that the use of the definite article can signify a narrowing intent. *See, e.g.*, *State v. Lykins*, 357 Or 145, 159, 348 P3d 231 (2015) ("As a grammatical matter, the definite article, 'the,' indicates something specific, either known to the reader or listener or uniquely specified.").

The court, however, has also cautioned that the use of the definite article is not always, so to speak, definitive. *See, e.g.*, *SAIF v. DeLeon*, 352 Or 130, 138, 282 P3d 800 (2012)

("[T]he definite article 'the' is not dispositive."). Its use in context may reveal an intention to encompass less categorically specific referents. *See, e.g.*, [*State v. Stark*](), 354 Or 1, 7-8, 307 P3d 418 (2013) (statutory reference to "the judgment" applies not only to original judgment but also to subsequently entered judgments). This is such a case for several reasons.

To begin with, the statutory context suggests that it is not likely that the legislature intended its use of the definite article in ORS 124.100(5) to be dispositive. In fact, ORS 124.100 refers to "physical or financial abuse" a number of times, only sometimes using the definite article. ORS 124.100(2), for example, provides that a vulnerable person who has been abused may bring an action against a person "who has permitted another person to engage in physical or financial abuse"—without specifying "the" abuse against that particular vulnerable person. Presumably, the abuse mentioned in subsection (2) is the same as the abuse mentioned in subsection (5) of the same statute. Subsection (5) in fact specifically states that it refers to an action "brought under this section," namely, ORS 124.100(2). Yet subsection (2) is phrased more generally, not referring solely to the particular abuse that another person may commit against a particular vulnerable person.[3] At the very least, the inconsistency in phrasing between subsections (2) and (5) in this regard cautions against placing too much emphasis on the use of the definite article in the latter subsection.

Aside from that, the consequences of adopting AMR's proposed reading of the statute give us pause. If AMR is correct that ORS 124.100(5) applies only under circumstances in which a reasonable person should have known of the very abuse that its actions permitted, then, logically, the statute would practically never apply. It would come into play only when a defendant participated in or was present during an instance of abuse, or when the defendant

---

[3] The wording of ORS 124.100(2) itself appears internally inconsistent on this very point. It states that a vulnerable person who was the victim of physical or financial abuse may bring an action against "any person who has caused *the* physical or financial abuse" (using the definite article) and any person "who has permitted another person to engage in physical or financial abuse" (omitting any article).

had reason to know in advance of a perpetrator's plan to abuse a particular vulnerable person. Under AMR's reading of ORS 124.100(5), then, an employer that has received confirmed reports of an employee's repeated abuse of multiple vulnerable patients would face no liability under that statute for allowing that employee to abuse a vulnerable patient, so long as the employer had no reason to know of the employee's abuse of *that specific patient*.

AMR insists that the legislative history demonstrates that ORS 124.100(5) was intended to have precisely that limited effect. According to AMR, that history shows that the statute was "directed toward 'abusers' and toward no one else. Individuals who 'permitted' abuse by third parties were just a sub-category of 'abusers.'" AMR argues that the legislative history demonstrates that to be the case in two ways. First, AMR relies on the *absence* of legislative history suggesting a broader intended meaning of the statute. It reasons that

> "there was no discussion about standards of negligence or recklessness fitting into this statute, or about potentially applying this statute against negligent employers with wayward employees. Had such standards been intended, one might expect some discussion[,] given that such a law would have far-reaching implications * * *."

Second, AMR argues that the focus of the legislature in passing what eventually became ORS 124.100 was on abusers and that the law was not intended to target "institutional providers of care or services." For the reasons that follow, AMR's reliance on that "history" is unavailing.

We begin with AMR's reliance on an absence of any comment on the constructive knowledge requirement during the legislature's deliberations on what became ORS 124.100(5). As this court has stated on a number of occasions, silence in the legislative history of a statute, by itself, is not often reliable evidence that the legislature intended anything. *Lake Oswego Preservation Society v. City of Lake Oswego*, 360 Or 115, 129, ___ P3d ___ (2016) ("[N]egative inferences based on legislative silence are often unhelpful in statutory interpretation."); *Weldon v. Bd. of Lic. Pro. Counselors and Therapists*, 353 Or 85, 100, 293 P3d 1023

(2012) (stating reluctance to infer legislative intent from silence); *State v. Rutley*, 343 Or 368, 375, 171 P3d 361 (2007) ("statutory silence alone is not a sufficiently clear indication of legislative intent to dispense with a culpable mental state"). Inferring legislative intent on the basis of a lack of comment in the legislative history is problematic for several reasons.

At the outset, it relies on unrealistic assumptions about the legislative process and the omniscience of legislators. That is, it assumes that legislators are in a position to predict all the potential consequences of legislation and that they will always address them. Such an assumption ignores the fact that legislators often cannot be aware of every potential consequence of enacting the bills before them, as well as the fact that the press of time in legislative sessions of limited duration often does not provide legislators the opportunity to comment on all of a bill's potential consequences. Moreover, drawing conclusions from silence in legislative history misapprehends the nature of legislative history itself, which often is designed not to explain to future courts the intended meaning of a statute, but rather to persuade legislative colleagues to vote in a particular way. Thus, for example, a proposed legislative change to the status quo might not prompt comment precisely because everyone understands that the law will have that effect or because supporters do not wish to draw attention to it. *See generally* Anita S. Krishnakumar, *The Sherlock Holmes Canon*, 84 Geo Wash L Rev 1, 21-35 (2016) (detailing problems with drawing inference from silence in legislative history);[4] John C. Grabow, *Congressional Silence and the Search for Legislative Intent: A Venture Into "Speculative Unrealities*," 64 BUL Rev 737, 765 (1984) ("necessarily frequent silences of Congress provide a wholly unreliable and unprincipled basis for inferring legislative intent").

As for the legislative history that does exist, we find little support for the conclusions that AMR draws from it. What is now ORS 124.100 was introduced in 1995 as

---

[4] The name of the article is taken from the Sherlock Holmes story *Silver Blaze*, in which a watchdog failed to bark while a racehorse was stolen, leading Holmes to infer that the dog knew the thief, its trainer. Sir Arthur Conan Doyle, *Silver Blaze*, in *The Complete Sherlock Holmes* 349 (1930).

Senate Bill (SB) 943. It was drafted by an elder-law practitioner, Bertalan, with input from an elder-abuse task force. Bertalan testified before the Senate Judiciary Committee following the introduction of the bill and its referral to that committee. Tape Recording, Senate Committee on Judiciary, SB 943, Mar 23, 1995, Tape 69, Side A (statement of Lisa Bertalan). She explained that the focus of the bill was not the nursing home industry because that industry already is heavily regulated; rather, her focus in drafting the bill was less-regulated entities and individual abusers of the elderly and the vulnerable. Tape Recording, Senate Committee on Judiciary, SB 943, Apr 12, 1995, Tape 102, Side B (statement of Bertalan). Her written testimony explained:

> "The purpose of [the bill] is to protect elders and incapacitated adults from physical and financial abuse \*\*\*. The aim of Senate Bill 943 is to prevent and provide a specific remedy for physical abuse and financial exploitation from relatives, the new 'friend' who suddenly cuts the elderly person off from family and the rest of the world, phony contractors who sell the elderly person substandard services or unnecessary goods, and the acquaintance who suddenly becomes the elderly person's live-in caregiver in exchange for the deed to the family home or other property."

Testimony, Senate Committee on Judiciary, SB 943, Mar 23, 1995, Ex R (statement of Bertalan); *see also* Testimony, House Committee on Judiciary, SB 943, May 12, 1995 Ex D (statement of Bertalan) (to similar effect; purpose of bill is to provide specific remedy for "physical abuse and financial exploitation" of elderly and incapacitated persons, against relatives, acquaintances, businesspeople, and live-in-caregivers who perpetrate abuses).

Following introduction of the bill, representatives of the Oregon Health Care Association proposed exclusions for nursing facilities, residential care facilities, and assisted living facilities. In response, an amendment was introduced to do just that. The committee approved the bill with that amendment. The Senate then passed the bill unanimously, as did the House of Representatives.

Nothing in the foregoing history suggests that the part of SB 943 that became ORS 124.100(5) was intended

to apply only to individual abusers and not to employers or other institutions. To be sure, it does reflect a concern that the provisions of the bill not apply to *particular* institutions, namely, nursing facilities, residential care facilities, and assisted living facilities. And, consistently with that concern, the final version of the legislation contained an exemption for those institutions. *See* ORS 124.115 (setting out persons not subject to action under ORS 124.100). But no other institutions or entities—businesses such as AMR, for example—were included in that limited list. The express exclusion of such a list of certain entities strongly suggests that the legislature intended not to exclude any others not listed. *See [Crimson Trace Corp. v. Davis Wright Tremaine LLP](#)*, 355 Or 476, 497, 232 P3d 980 (2014) (when a statute lists specific exemptions, "the legislature fairly may be understood to have intended to imply that no others are to be recognized").

If the reference to "circumstances in which a reasonable person should have known of the physical or financial abuse" in ORS 124.100(5) does not bear the narrow interpretation for which AMR contends, there remains the question of what it does mean. As we noted earlier, that wording is reasonably capable of referring not just to circumstances in which a reasonable person should have known of a particular instance of abuse against a particular plaintiff; rather, it could also refer to circumstances in which a reasonable person should have known of the same or similar abuse of a vulnerable person. Said another way, the statute could be read to apply when, in light of information known or available to a reasonable person, that person should have known of the kind of abuse that in fact occurred. That interpretation is the better of the reasonable possibilities. It gives effect to all the statute's terms, in particular, to both of its different mental state requirements. It results in no redundancy or conflict between statutory terms. It inserts nothing into the statute that the legislature did not include. At the same time, it omits nothing from the statute that the legislature enacted. And it ensures that the statute applies beyond the very narrow circumstances in which a defendant either participated in or was present during abuse, or had reason to know in advance of a plan to abuse a particular

vulnerable person, consistently with the apparent purpose of the statute as reflected in its wording and its enactment history.

To summarize: ORS 124.100(5) refers to two different mental states, one referring to actual knowledge and the other to constructive knowledge. The former refers to a defendant's act or failure to act. The latter refers to the circumstances in which that act or failure to act occurs. The statute thus provides that there must be evidence that a defendant knowingly acted or failed to act under circumstances in which a reasonable person should have known that the same sort of abuse of a vulnerable person that occurred would, in fact, occur.[5] So, for example, ORS 124.100(5) applies if an employer such as AMR knowingly (as opposed to, say, inadvertently) schedules an employee to work on an ambulance run under circumstances in which a reasonable person should have known that the sort of abuse inflicted on the plaintiff would occur.

## B.  *Application*

With the foregoing interpretation in mind, we turn to the question whether the trial court erred in granting AMR's summary judgment motion as to all six plaintiffs. Summary judgment is appropriate if, viewing the evidence in the light most favorable to the nonmoving party, no genuine issue of material fact exists "and the moving party is entitled to judgment as a matter of law." *See Chapman v. Mayfield*, 358 Or 196, 204, 361 P3d 566 (2015) (so stating and citing ORCP 47 C).

As explained in our earlier factual summary, the incidents at issue in this case involved instances of abuse inflicted on six different vulnerable persons—plaintiffs—by AMR's employee, Haszard. AMR does not dispute that each of the six plaintiffs qualified as a "vulnerable person" within the meaning of ORS 124.100(1)(e).

---

[5] As we note later in this opinion, the evidence in the record is sufficient to permit a reasonable juror to find that a reasonable person in AMR's position should have known that the sort of abuse that did occur would, in fact, occur. We need not address whether the statute also contemplates liability under circumstances in which a reasonable person should have known that such abuse as did occur was merely foreseeable.

None of the six plaintiffs reported her interaction with Haszard to AMR, to other medical staff, or to the police. It thus is undisputed that, until discovery during the Herring litigation several years later, AMR had no actual knowledge of Haszard's physical abuse of any of the six plaintiffs in this case. The question, however, is not whether AMR actually knew about that abuse. Instead, the question is whether plaintiffs established genuine issues of material fact as to whether AMR knowingly scheduled Haszard to work as a paramedic under circumstances in which a reasonable person should have known that the sort of abuse that the plaintiffs suffered would occur. AMR does not suggest that it had not knowingly assigned Haszard to work as a paramedic during each of the six alleged incidents of abuse. That leaves, then, the question whether a genuine issue of material fact exists about whether AMR did so under circumstances in which a reasonable person should have known that the same type of abuse that occurred would in fact occur.

1.  *Plaintiff Akre*

The earliest incident involving a plaintiff in this case concerned plaintiff Akre. Viewed in the light most favorable to plaintiffs, evidence in the record shows that, by the time of plaintiff Akre's abuse, AMR knew that other similarly situated vulnerable persons had reported that Haszard had abused them. Specifically, in February 2006, Spain had called AMR and reported to its receptionist that one of the company's paramedics was a "freak" who had inappropriately touched her, that it was unsafe for that paramedic to transport little girls, and that he should be taken off ambulance duty. Additionally, there is evidence that complaints, such as those alleging sexual misconduct, were entered into a database and forwarded to AMR's county operations manager.

There is also evidence that, one month after the Spain incident, Whalen reported in an AMR customer survey that Haszard had failed to respect her privacy at the hospital by not looking away while a nursing assistant helped Whalen into a gown, despite her obvious discomfort. AMR followed up with an interview of Whalen, during which she

complained that Haszard had stared at her and acted sexually aroused. Whalen later recounted that the AMR investigator had "dismissed everything that [she had] said," telling her that she "must have been imagining things." The investigator, however, did write an internal report describing Whalen's complaint and concluding that it had been "substantiated." Plaintiff Akre's abuse occurred about three weeks after that.

There is thus evidence that, at the time of plaintiff Akre's abuse, AMR had already received at least two complaints of sexually inappropriate conduct on the part of its paramedic, Haszard. Indeed, one of those reports had been investigated and confirmed as having been "substantiated." Under those circumstances, there is at least a genuine issue of fact about whether AMR should have known of the sort of abuse that plaintiff Akre suffered. To be sure, AMR disputes the Spain report, noting that it has no record of such a complaint call having been placed or, if it had been placed, that the receptionist ever reported the call to anyone else. But AMR's dispute establishes no more than that there is a genuine issue of material fact about what transpired. At this stage, we are constrained to view the evidence in the light most favorable to plaintiff. In that light, there is at least a genuine issue of material fact about whether AMR should have known when it assigned Haszard to ambulance duty that the same sort of abuse inflicted on plaintiff Akre would occur. *See Towe v. Sacagawea, Inc.*, 357 Or 74, 109-10, 346 P3d 1207 (2015) (evidence mixed as to factual issue in dispute, reasonable juror could find facts either way, and so case presented factual issues for jury to resolve; trial court therefore erred in granting summary judgment). The trial court therefore erred in granting summary judgment against plaintiff Akre.

### 2.  *Plaintiffs Shaftel, Asbury, and Terpening*

By the time of the alleged abuse against plaintiffs Shaftel, Asbury, and Terpening, there is evidence that AMR had received even further reports of Haszard's abusive conduct toward vulnerable persons. In December 2006, Rotting was transported by ambulance with Haszard attending. During that transport, Haszard touched Rotting

in a manner similar to the sexual touching that plaintiff Akre had alleged; he also slowly stroked Rotting's thigh. Rotting reported the incident to a nurse and to family members, and her son called AMR. Her son spoke with the same supervisor who had investigated the Whalen complaint, and the supervisor stated that there would be an investigation. The investigation, however, was limited to interviewing Haszard, who denied having engaged in any inappropriate conduct. Rotting's son called AMR again and stated that the police should be involved. AMR took no further action, although its risk management department was notified that Rotting might file a complaint.

A month later, Haszard sexually abused plaintiff Shaftel. And three weeks after that, he sexually abused plaintiff Asbury. Three weeks later, he also sexually abused plaintiff Terpening. Thus, by the time of Haszard's abuse of those three plaintiffs, there is evidence that AMR had received three reports of its employee's abuse of vulnerable persons under circumstances similar to those later incidents of abuse that actually occurred. Again, AMR disputes some of the foregoing evidence, but that is not the point at this stage in the proceedings. On the record before us, viewed in the light most favorable to plaintiffs Shaftel, Asbury, and Terpening, there is at least a genuine issue of material fact about whether AMR should have known that the sort of abuse that plaintiffs Shaftel, Asbury, and Terpening suffered would occur. The trial court therefore erred in granting summary judgment against those three plaintiffs.

### 3. *Plaintiffs Webb and Corning*

Haszard's abuse of plaintiffs Webb and Corning occurred not long after the abuse of plaintiffs Shaftel, Asbury, and Terpening. By that time, AMR had received yet another report of abuse. In March 2007, Pries reported to police that Haszard had sexually abused her during an AMR ambulance transport by taking her hand, placing it inside her pants, and manipulating it. Police spoke with an AMR supervisor, and several AMR employees, including Haszard, then met with a company risk-management official. AMR ultimately determined that it could not substantiate Pries's allegations, but it warned Haszard in writing

that either that incident or Rotting's would be reopened if more information came to light. AMR did not make any effort to contact Pries, did not request further information from police, and did not tell police about the Rotting complaint. A month later, Haszard abused plaintiff Webb during an ambulance transport. Four months after that, he abused plaintiff Corning.

Thus, by the time of Haszard's abuse of plaintiffs Webb and Corning, AMR had received four reports of abuse of vulnerable persons by its employee Haszard, including one report involving the police. Indeed, there is evidence that AMR warned Haszard not to engage in such conduct in the future. That evidence is sufficient to establish a genuine issue of material fact about whether a reasonable person in AMR's position should have known that the sort of abuse that plaintiffs Webb and Corning suffered would occur. As a result, the trial court erred in granting summary judgment for AMR against plaintiffs Webb and Corning.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.