NOT FOR PUBLICATION

**FILED**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

OCT 23 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| E.J.T., a minor, by and through his Conservator, InTRUSTment Northwest, Inc.,<br><br>        Plaintiff - Appellant,<br><br>  v.<br><br>JEFFERSON COUNTY, a public body; TYLER W. ANDERSON, in his individual capacity; ARJAN ARYANFARD, in his individual capacity,<br><br>        Defendants - Appellees. | No. 24-1717<br><br>D.C. No.<br>3:20-cv-01990-HZ<br><br><br>MEMORANDUM[*] |

Appeal from the United States District Court
for the District of Oregon
Marco A. Hernandez, District Judge, Presiding

Argued and Submitted August 19, 2025
Portland, Oregon

Before: CALLAHAN and MENDOZA, Circuit Judges, and SNOW, District Judge.[**]
Partial Concurrence and Partial Dissent by Judge CALLAHAN.

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

[**] The Honorable G. Murray Snow, United States District Judge for the District of Arizona, sitting by designation.

In November 2017, when he was two-and-a-half years old, Plaintiff E.J.T. sustained a traumatic brain injury from severe abuse inflicted by his mother's boyfriend, with whom she sometimes resided. The injury left E.J.T. blind, unable to walk or talk, and dependent upon tubes to eat and breathe. E.J.T. alleges that the injury could have been prevented had either Deputy Tyler Anderson of the Jefferson County Police Department ("Deputy Anderson") or Officer Arjan Aryanfard of the Warm Springs Reservation Police Department ("Officer Aryanfard") followed their legal duties after E.J.T.'s mother reported to them an earlier incident of possible abuse suffered by E.J.T. that occurred in October 2017. For that incident, E.J.T.'s mother identified E.J.T.'s father, a member of the Warm Springs Tribe and resident of the Warm Springs Indian Reservation, as the possible perpetrator.

E.J.T. brought a statutory negligence claim against all defendants for failure to follow Oregon child abuse reporting statutes under O.R.S. chapter 419B and a statutory claim for Abuse of a Vulnerable Person under O.R.S. § 124.105. He also alleged violations of 42 U.S.C. § 1983 against Deputy Anderson and Jefferson County (the "Jefferson County defendants").

E.J.T. challenges the district court's (1) dismissal of the statutory Abuse of a Vulnerable Person claim against Officer Aryanfard with prejudice; (2) denial of leave to add an equal protection claim against Officer Aryanfard; (3) dismissal of the statutory failure-to-report negligence claim against all defendants with prejudice

and denial of leave to amend to allege a common law negligence claim; (4) grant of summary judgment to Jefferson County defendants on the § 1983 claims; and (5) dismissal of the statutory claim for Abuse of a Vulnerable Person against the Jefferson County defendants.

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review a dismissal based on the conclusion that a person is not a state actor de novo and the district court's findings of fact for clear error, *Lee v. Katz*, 276 F.3d 550, 553 (9th Cir. 2002); a dismissal with prejudice and without leave to amend for abuse of discretion, *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1141-42 (9th Cir. 2021); a grant of summary judgment on a § 1983 claim de novo, *L.F. v. Lake Washington Sch. Dist. #414*, 947 F.3d 621, 625 (9th Cir. 2020); and a dismissal based on an interpretation of a statute de novo, *Cal. Sportfishing Prot. All. v. Chico Scrap Metal, Inc.*, 728 F.3d 868, 872 n.3 (9th Cir. 2013). We affirm in part, reverse in part, and remand for further proceedings consistent with this disposition.

1.    The district court did not err in dismissing E.J.T.'s statutory claim against Officer Aryanfard for Abuse of a Vulnerable Person. The court dismissed the claim with prejudice on the basis that Aryanfard was acting solely as a tribal law enforcement officer. E.J.T. does not contest that dismissal would be appropriate if Officer Aryanfard were a tribal officer acting solely under his tribal law enforcement authority. But E.J.T. argues that Officer Aryanfard was instead acting as a state

officer because he was authorized to enforce state law under O.R.S. § 181A.940 *et seq*.

While Oregon law does "provide authorized tribal police officers with the *ability* to exercise the powers" of state law enforcement officers, O.R.S. § 181A.944(1) (emphasis added), the statute further provides that "an authorized tribal police officer is not an officer, employee or agent of the State of Oregon or of any other public body." *Id.* § 181A.944(8). Moreover, Oregon law "does not regulate the conduct or activities of tribal police officers or tribal governments occurring in Indian country or on the land of a tribal government or outside of Indian country or the land of a tribal government but within a tribe's civil or criminal jurisdiction." *Id.* § 181A.942(2). Under the plain language of the statute, the mere fact that Officer Aryanfard was authorized in certain circumstances to act pursuant to state law does not make tribal police officers subject to civil liability arising from Oregon law when they are pursuing investigations within a tribe's criminal jurisdiction.

E.J.T. fails to submit facts demonstrating that Officer Aryanfard was acting other than under the tribe's criminal jurisdiction. Officer Aryanfard became involved in the case when the Jefferson County defendants referred the October 2017 report that E.J.T. had allegedly been abused by his father on the reservation to the Warm Springs Reservation Police Department so that a tribal officer could investigate the incident because Jefferson County lacked jurisdiction to do so. *See* 18 U.S.C.

4                                    24-1717

§ 1162(a) (granting Oregon "jurisdiction over offenses committed by or against Indians" in "[a]ll Indian country within the State, *except the Warm Springs Reservation*" (emphasis added)). Officer Aryanfard testified in his deposition that he was pursuing a "tribal investigation" because "[w]e had a tribal suspect . . . [and] someone I believed to be a tribal victim," and that the incident "was purported to have occurred on the reservation." Looking to Officer Aryanfard's "function, rather than intent," *see Bressi v. Ford*, 575 F.3d 891, 897 (9th Cir. 2009), as E.J.T. argues, the evidence indicates that Officer Aryanfard functioned as a tribal actor, not a state actor. The district court, after authorizing discovery and conducting a separate hearing on the question, did not err in concluding that Officer Aryanfard was acting solely under tribal law. Officer Aryanfard was therefore not subject to state law claims.[1]

2.    Because the district court appropriately held that Officer Aryanfard was acting solely under tribal law, it did not err in denying leave to amend the complaint to allege an equal protection claim under § 1983. *See R.J. Williams Co. v. Fort Belknap Hous. Auth.*, 719 F.2d 979, 982 (9th Cir. 1983) ("[A]ctions taken under color of tribal law are beyond the reach of § 1983 . . . .").

---

[1]    Given our determination that the district court did not err in determining that Officer Aryanfard was acting solely under tribal law, we need not consider the district court's alternative ruling dismissing state law claims against Officer Aryanfard due to the need for Plaintiff to exhaust tribal court remedies.

3.     Nor did the district court abuse its discretion in denying E.J.T. leave to amend his complaint to add common law negligence claims. After dismissal of the statutory negligence claim against all Defendants, E.J.T. sought to add three new negligence theories "based on the same alleged facts [and] same general allegations": special relationship, negligence per se, and general foreseeability. E.J.T. did not raise these theories at the outset of the case. Instead, he argued for certification to the Oregon Supreme Court on whether he could bring his statutory negligence claim. Under these circumstances, the district court did "not abuse its discretion in denying a motion to amend where the movant presents no new facts but only new theories and provides no satisfactory explanation for his failure to fully develop his contentions originally." *See Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995) (citation omitted).

4.     The district court properly granted summary judgment to the Jefferson County defendants on the § 1983 equal protection claims. "The central inquiry in an Equal Protection Clause claim is whether a government action was motivated by a discriminatory purpose." *Ballou v. McElvain*, 29 F.4th 413, 422 (9th Cir. 2022). E.J.T. alleges that Deputy Anderson's decision not to investigate or cross-report E.J.T.'s alleged abuse by his father to the Oregon Department of Human Services was motivated by discriminatory intent, based on E.J.T.'s Native American heritage. But such a bare and conclusory assertion is "inadequate, without substantial factual

evidence, to raise an issue precluding summary judgment." *See Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983).

Evidence from the record, even viewed in the light most favorable to E.J.T., demonstrates that Officer Anderson failed to investigate the report of abuse because he believed the case was not within the Jefferson County Police Department's jurisdiction. Deputy Anderson visited E.J.T. and his family members at the hospital. They told him that E.J.T. was injured during a visit to his father's house. When Deputy Anderson learned that E.J.T.'s father lived on the reservation, he responded that he did not have jurisdiction and subsequently referred the case to Warm Springs Police Department. Deputy Anderson stated in his deposition testimony that, whenever the Jefferson County Police Department received report of an injury that allegedly occurred within the reservation, "we don't have jurisdiction, so we always called the reservation, or their tribal police, to come and take the calls."

E.J.T. fails to show that a discriminatory purpose "more likely than not" motivated Officer Anderson, *see Ballou*, 29 F.4th at 422 (citation modified), or that a discriminatory purpose "was a motivating factor," *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977), to not investigate or cross-report the report of abuse. The district court, therefore, did not err in granting summary judgment to Officer Anderson on E.J.T.'s § 1983 claim. And because "municipalities cannot be held liable when the individual police officer has inflicted

no constitutional injury," *Yousefian v. City of Glendale*, 779 F.3d 1010, 1016 (9th Cir. 2015), the district court properly granted summary judgment to Jefferson County as well.

5. The district court did err, however, in dismissing E.J.T.'s statutory claim for Abuse of a Vulnerable Person under O.R.S. § 124.105 against the Jefferson County defendants on the basis that E.J.T. did not meet the statutory definition for a "vulnerable person." E.J.T. qualifies as a vulnerable person under O.R.S. § 124.100 because he met the statutory definition for "incapacitated" at the time of his injuries.

The Abuse of a Vulnerable Person statute, O.R.S. § 124.100 *et seq.*, protects four categories of "vulnerable" persons: (1) elderly persons, (2) financially incapable persons, (3) "incapacitated" persons, and (4) persons with disabilities. O.R.S. § 124.100(1)(e). O.R.S. § 125.005(5), in turn, sets forth the definition of "incapacitated":

> "Incapacitated" means a condition in which a person's ability to receive and evaluate information effectively or to communicate decisions is impaired to such an extent that the person presently lacks the capacity to meet the essential requirements for the person's physical health or safety.
>
> "Meeting the essential requirements for physical health and safety" means those actions necessary to provide the health care, food, shelter, clothing, personal hygiene and other care without which serious physical injury or illness is likely to occur.

24-1717

Under a plain reading of the statute, E.J.T., as a two-and-a-half-year-old child, was clearly in a condition in which his "*ability* to receive and evaluate information effectively and communicate decisions" was impaired. *See* O.R.S. § 125.005(5) (emphasis added). Under the ordinary meaning of "impaired," E.J.T.'s self-protecting ability was substantially diminished or made worse due to his young age. *Webster's Third* defines "impair" as "to make worse," "diminish in quantity, value, excellence, or strength," or "do harm to." *Impair*, Webster's Third New Int'l Dictionary 1131 (unabridged ed. 1993).[2] Had E.J.T. been older, he likely could have "receive[d] and evaluate[d] information effectively"—and would not have been "presently"[3] diminished by his infancy. *See* O.R.S. § 125.005(5). Thus, E.J.T. was

---

[2]    The Oregon Supreme Court "consults *Webster's Third* more often than any other dictionary." *Kohring v. Ballard*, 325 P.3d 717, 721 n.2 (Or. 2014) (explaining that the dictionary has a "descriptive" focus on "ordinary usage" in contrast with other dictionaries with a "prescriptive" focus on "correct" usage). The current definition of "incapacitated" was added to the Oregon Revised Statues in 1995. *See* Or. Laws 1995, ch. 664, § 1(5). Because "it is important to use sources contemporaneous with the enactment of the statute," *Comcast Corp. v. Dep't of Revenue*, 337 P.3d 768, 776 n.7 (Or. 2014), the edition of *Webster's Third* most contemporary to the enactment of the statutory language is the 1993 edition.

[3]    Jefferson County defendants argue that E.J.T. "was not incapacitated at all" because he "was a normal developing 2-year-old" at the time of his injuries and that he "had not yet fully developed into a person that could do the things done by an adult." This argument ignores the import of the word "presently" in the definition of "incapacitated." *See State v. Clemente-Perez*, 359 P.3d 232, 239 (Or. 2015) (Oregon courts should "assume that the legislature did not intend any portion of its enactments to be meaningless surplusage."). Accepting Jeferson County defendants' argument would transform the statute into one that looks at *future* capacity, rather than present capacity.

in an incapacitated "condition,"[4] *see id.*, at the time of his injuries, and qualified as an "incapacitated person" pursuant to § 125.005(5).

In holding that O.R.S. § 125.005(5) required that a "condition" must *cause* an impairment for a person to meet the definition of "incapacitated," the district court misread the text of the statute. The plain text of the statute states that a person does *not* have to be physically or mentally disabled to be vulnerable. In addition to being elderly or financially incapable, the statute defines someone as vulnerable who either (1) is incapacitated or (2) has a "disability [and] is susceptible to . . . injury because of the person's physical or mental impairment." O.R.S. § 124.100(1)(e)(D).

The statute's definition of "person with a disability" does require that a person have a physical or mental impairment. *See id.* § 124.100(1)(d). But the statute's definition of "incapacitated" carries no such requirement. Rather, incapacity is determined by a person's present abilities. *Id.* § 125.005(5) ("'Incapacitated' means

---

[4]     Such a construction is supported by the dictionary definition of "condition." The word can be defined as "a mode or state of being," a "state with reference to mental or moral nature, temperament character, or disposition," or "something that exists as an occasion of something else." *Condition*, Webster's Third New Int'l Dictionary 473 (unabridged ed. 1993). And it is in this sense that O.R.S. § 125.005(5) uses the word. For example, earlier in O.R.S. § 125.005, the Oregon legislature defined "financially incapable" as "a condition in which a person is unable to manage financial resources of the person effectively for reasons including . . . mental illness, mental retardation, physical illness or disability . . . ." O.R.S. § 125.005(3). The "condition" of being financially incapable is created by the "reasons" listed in the statute—a similarly passive construction of the word "condition."

a condition in which a person's ability . . . is impaired . . . ."). The statutory definition does not require that an individual *suffer from* or *have* a "condition" that impairs one's self-protecting ability. Instead, O.R.S. § 125.005(5) requires that the person's "ability" to do certain things must be impaired. In other words, the individual's impaired ability creates the "condition" of incapacity—not the reverse. To interpret the statute as did the district court makes the statute's inclusion of a "person with a disability" as a "vulnerable person" mere surplusage and is not appropriate under Oregon law. *See Clemente-Perez*, 359 P.3d at 239 (Oregon courts should "assume that the legislature did not intend any portion of its enactments to be meaningless surplusage.").

The Oregon legislature's creation of a separate category for "elderly persons," O.R.S. § 124.100(1)(e)(A), also does not imply that the legislature chose *not* to protect infants. It is possible for a person of 65 years of age or older to not be vulnerable under the statutory definition of incapacitation. *Id.* § 124.100(1)(a). Thus, adopting a separate category of "elderly persons" demonstrates that the Oregon legislature sought to *further* the protections available under the Abuse of a Vulnerable Person statute to persons over 65, regardless of incapacitation. It does not demonstrate that the legislature intended to exclude vulnerable young children.

The Jefferson County defendants argue that the Abuse of a Vulnerable Person statute only applies to elders and incapacitated adults, which would not include

E.J.T. Jefferson County defendants rely almost exclusively on the legislative history of O.R.S. § 124.100 *et seq.* in advancing this argument. While E.J.T. concedes that elders and incapacitated adults may have been the population that the drafting attorney of O.R.S. § 124.100 *et seq.* originally sought to protect in 1995, the Oregon legislature's subsequent update to the statute in 1997 specifically deleted the former requirement that the protected "incapacitated" person be an adult. *See* Or. Laws 1997, ch. 249 (introduced as H.B. 2509).[5] Because the Jefferson County defendants' supposed legislative intent does "not find expression in the actual wording of the statute, that legislative history is entitled to 'no weight.'" *See State v. Rainey*, 431 P.3d 98, 103 (Or. Ct. App. 2018) (quoting *State v. Gaines*, 206 P.3d 1042, 1051 (Or. 2009)).

Accordingly, the district court erred in dismissing E.J.T.'s statutory claim against the Jefferson County defendants for Abuse of a Vulnerable Person for failure to satisfy the definition of "incapacitated." Therefore, the district court is affirmed in the dismissal of all of E.J.T.'s other claims, but the district court's dismissal of the state law claim for Abuse of a Vulnerable Person against Deputy Anderson and Jefferson County is reversed and remanded for further consideration.

---

[5]   H.B. 2509 changed the reference to the definition for "incapacitated person" from the former O.R.S. § 126.003(5), which required that the person be an "adult," to O.R.S. § 125.005(5), which does not contain such a requirement.

**AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this disposition.**

*E.J.T. v. Jefferson County*, No. 24-1717

CALLAHAN, J., concurring in part and dissenting in part:

I join Parts 1-4 of the panel majority's memorandum disposition. But I respectfully dissent from Part 5, which concludes that the district court erred in dismissing E.J.T.'s statutory claim against the Jefferson County defendants for abuse of a vulnerable person. I would instead affirm the district court's dismissal of that claim because E.J.T., at the time of his injuries, did not qualify as a "vulnerable person" under O.R.S. § 124.105.

Oregon law provides that a "vulnerable person" may bring a claim against a defendant "for permitting [a third] person to engage in physical or financial abuse if the [defendant] knowingly acts or fails to act under circumstances in which a reasonable person should have known of the physical or financial abuse." O.R.S. § 124.100(5). Section 124.100 enumerates specific categories of individuals who may qualify as a vulnerable person. Relevant here, the list includes persons who are "incapacitated." O.R.S. § 124.100(1)(e)(C). The term "incapacitated" means:

> [A] condition in which a person's ability to receive and evaluate information effectively or to communicate decisions is impaired to such an extent that the person presently lacks the capacity to meet the essential requirements for the person's physical health or safety. "Meeting the essential requirements for physical health and safety" means those actions necessary to provide the health care, food, shelter, clothing, personal hygiene and other care without which serious physical injury or illness is likely to occur.

O.R.S. § 125.005(5).

1

Thus, a person qualifies as "incapacitated" only if he is in a "condition in which [his] ability . . . is impaired." *Id*. Here, the plain meaning of "condition" is "a state of health" or "a state of readiness or physical fitness." *Condition*, Webster's II New College Dictionary (1995); *accord Condition*, Merriam-Webster's Collegiate Dictionary (10th ed. 1995). "Impair" means "to damage or make worse by or as if by diminishing in some material respect." *Impair*, Merriam-Webster's Collegiate Dictionary (10th ed. 1995); *accord Impaired*, Webster's II New College Dictionary (1995). And "impaired" means "being in a less than perfect or whole condition: as . . . handicapped or functionally defective – often used in combination," e.g., "hearing-impaired." *Impaired*, Merriam-Webster's Collegiate Dictionary (10th ed. 1995).

At the relevant time, E.J.T. suffered from no condition that impaired his abilities. Nothing had handicapped him, and he "was a generally healthy, normally-developed, 2-year-old child." Therefore, based on the plain meaning of the statutory text, E.J.T. was not an "incapacitated person."

The statutory context also supports this interpretation. For one, the Legislature explicitly protected the category of "elderly persons," defined as all persons aged 65 and older, as "vulnerable persons"—regardless of whether their abilities are impaired. O.R.S. § 124.100(1)(a), (1)(e)(A). This shows that the Legislature knew how to protect persons with normal abilities for their age when it

2

intended to do so. But the Legislature did not create any separate category of "vulnerable persons" to cover young children. Notably, in adopting the definition of "incapacitated" from Chapter 125, the Legislature did not also adopt that chapter's definition of "minor," which includes "any person who has not attained 18 years of age." O.R.S. § 125.005(6).[1]

Second, at the time that this statutory scheme was enacted, there already existed a separate statutory scheme governing the mandatory reporting of child abuse, which now exists in O.R.S. Chapter 419B. *See E. J. T. by and through InTRUSTment, Nw., Inc. v. Jefferson County*, 518 P.3d 568, 226 (Or. 2022) (describing the mandatory child abuse reporting scheme as "the product of numerous legislative enactments over the course of six decades"). The legislative history of the statutory scheme at issue here indicates that the Legislature intended to address elder abuse and the abuse of incapacitated adults (as distinct from child abuse) by providing a "separate cause of action for physical or financial abuse of an elderly person or incapacitated adult." *See Wyers v. Am. Med. Response Nw., Inc.*, 377 P.3d 570, 580 (Or. Ct. App. 2016).[2] I am not aware of any indication that

---

[1] Meanwhile, status as a "minor" and status as an "incapacitated person" are independent grounds for the appointment of a guardian or conservator. *See* O.R.S. §§ 125.305(1)(a), 125.400.

[2] The statutory scheme originally applied to "elderly persons" ("65 or more years of age") and to "incapacitated persons." Or. Laws 1995, ch. 671, § 1. The

the Legislature intended its newly created cause of action—one that provides for treble damages and attorney fees, O.R.S. § 124.100(2)—to apply to all cases of abuse of young children.

Finally, two of the three courts that have addressed this question of whether a young child with normal abilities is an "incapacitated person"—the district court in this case and the trial court in *Piazza v. State ex rel. Department of Human Services and Oregon Youth Authority*, 323 P.3d 444, 446-47 (Or. Ct. App. 2014)—have answered "no." *But see T.N. v. Harper*, No. 24CV03587, 2024 Ore. Cir. LEXIS 6410, at *10 (Or. Cir. Ct. June 28, 2024) (granting leave to amend to plaintiff who was abused between the ages of 4 and 9 and reasoning that "[a] person's young age may prompt favorable inferences that they are incapacitated"). Because the Oregon Court of Appeals has yet to weigh in, *see Piazza*, 323 P.3d at 451-52 (affirming on alternative grounds), we should interpret the statute consistent with its plain meaning. Because the panel majority declines to do so, I respectfully dissent.

---

Legislature later introduced the term "vulnerable person" and added the category of "person[s] with disabilities" in 2005. Or. Laws 2005, ch. 386, § 1a.